**Arlene FLAX et al.**

v.

**W. S. POTTS et al.**

**Civ. A. No. 4205.**

United States District Court,
N. D. Texas,
Fort Worth Division.

Aug. 28, 1970.

Judgment vacated 5 Cir., 450 F.2d 1118.

L. Clifford Davis, Fort Worth, Tex., for plaintiffs.

Cecil A. Morgan, Fort Worth, Tex., for defendants.

## MEMORANDUM OPINION

BREWSTER, District Judge.

More than eight and a half years after the entry of judgment in this school integration case, the plaintiffs have filed a motion "for further relief" raising the question of whether the Fort Worth Independent School District is operating a unitary rather than a dual system, and objecting to the construction of a new high school in the Morningside area of the city.

This case was the first one tried by the author of this opinion after he went on the bench almost nine years ago. On December 14, 1961, the Court entered judgment declaring that the dual racial system under which the Fort Worth schools were being operated violated the constitutional rights of the minor children named as plaintiffs and of the other members of their class, ordering the defendants to submit a plan within thirty days after the judgment became final for effectuating a transition to a racially nondiscriminatory system, enjoining interference with the orderly administration of such plan as might be approved by the Court, and retaining jurisdiction to effectuate the plan. Flax v. Potts, D.C., 204 F.Supp. 458 (1962). In connection with the affirmance, Potts v. Flax, 5 Cir., 313 F.2d 284 (1963), the Court of Appeals directed that the defendant school board submit its plan within thirty days from the filing of the mandate in the trial court. The defendants promptly advised the Court of Appeals that they would waive their right to proceed further with their appeal, and asked that the mandate be issued immediately.[1]

The defendants timely filed a so-called "stair-step" plan[2] calling for racial desegregation of the first grade at the beginning of the 1963 fall school term, and for desegregation of an additional grade, progressing upwardly, at the beginning of each school term thereafter

---

1. During the period of this litigation, there were in existence in Texas certain statutes that had the effect of prohibiting school boards from voluntarily submitting to integration. See Boson v. Rippy, 5 Cir., 285 F.2d 43 (1961). The following in regard to the statute is quoted from the first opinion of this Court in the present case:

"* * * Section 1 of Article 2900a sets out: 'That no board of trustees nor any other school authority shall have the right to abolish the dual public school system nor to abolish arrangements for transfer out of the district for students of any minority race, unless by a prior vote of the qualified electors residing in such district the dual system therein is abolished.' To insure obedience of the statute, harsh penalties are provided against the public generally, as well as against the offending trustees individually in case of violations. The school district suffers by becoming ineligible to receive its share of state school funds, the students of the district by losing their accreditation, and the trustees by being subject to a fine ranging from $100 to $1,000." (204 F.Supp., at p. 466).

2. The "stair-step" plan was the one devised by the Court of Appeals for the Dallas, Texas school system (Boson v. Rippy, supra, note 1) shortly prior to the trial of this case; and was the type widely accepted in those days as being "a prompt start toward full compliance" with the mandate of Brown v. Board of Education, 1955, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083, looking toward the transition to a racially nondiscriminatory school system "as soon as practicable" and "with all deliberate speed." Boson v. Rippy said it was substantially the same as the one known as the "Nashville Plan" approved in Kelley v. Board of Education of City of Nashville, 6 Cir., 270 F.2d 209 (1959), cert. den. 361 U.S. 924, 80 S.Ct. 293, 4 L.Ed.2d 240.

until racial segregation was eliminated in all twelve grades, and for the integration of kindergarten at the end of such period. The plaintiffs filed a general objection to such plan on the ground that the period suggested for effecting the transition was too long, and a few specific objections. The Court modified the proposed plan to meet most of the plaintiffs' objections, and adopted it as modified.[3] The plaintiffs apparently felt that the plan ordered met the requirements of that day, as they did not appeal from it.

At the time of the trial, the school board had to resist integration to avoid losing state school funds for the system and fines against the board members under Article 2900a. It put up a good faith fight; but since the matter was decided by the courts,[4] it has sincerely, earnestly and effectively tried to effectuate as soon as possible a unitary school system devoid of racial discrimination. There has been no dragging of feet or delay in making a genuine effort as there was in Monroe v. Board of Commissioners of City of Jackson, 1968, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733. That policy has been accelerated with the election of new members of the school board and the employment of new and

3. The general plan so adopted appears in the following language in the Court's memorandum opinion dated May 3, 1963, in regard to the plan and the objections thereto:

"The following conclusions are reached after weighing the evidence in the light of the principles announced in the Brown case, supra:

"1. The entire school system of the Fort Worth Independent School District should not be desegregated at one time.

"2. While the School Board is acting in good faith, the plan submitted by it must be modified to the extent hereinafter provided.

"3. The 1963 fall school term is the earliest time at which desegregation can be started in such school system.

"4. A prompt and reasonable start toward full compliance with the ruling in the Brown case will be made by taking the following steps in the school system operated by the Fort Worth Independent School District:

"a. The desegregation of the first grade in all the schools beginning with the 1963 fall school term.

"b. The desegregation of all classes in the adult education program of such system beginning with the 1963 fall school term.

"c. The desegregation of all kindergarten classes beginning with the 1964 fall school term.

"5. Additional time will be necessary to implement complete desegregation of the entire school system 'in a systematic and effective manner'. The exact amount of time necessary can be determined better after the proper start has been made. Until the exact time can be determined, the School District will desegregate the second grade at the beginning of the 1964 fall school term, and will continue with the desegregation of an additional grade, progressing upwardly, at the beginning of each fall school term thereafter, until further order of this Court.

"6. Sections 5 a, b and c of the plan calling in substance for each first grade student to report with his parent or guardian at 'the school which the child would formerly have attended from his place of residence and notify the principal that the child will not attend that school' are racially discriminatory, and therefore will not be approved. Each first grade student, regardless of race or color, shall be permitted to go to the elementary school nearest his home for the purpose of enrolling just as if there had never been any racial segregation. The School Board may make reasonable provisions for enrollment of first grade students in advance of the beginning of school classes, but they shall not be based upon racial discrimination.

"7. The Court will approve the remainder of the plan submitted by the School Board insofar as it is not in conflict with any of the provisions of this opinion or of the order entered in connection therewith."

4. Boson v. Rippy, supra, footnote 1, says in footnote 11 that: "* * * We are further advised that the Attorney General of Texas has ruled that Article 2900a is not applicable where a school district desegregates pursuant to court order." It was generally understood in Texas that the Attorney General had reference to a court order entered after bona fide, not token, resistance.

considerably younger personnel in the administrative office, from the Superintendent and Deputy Superintendent on down. It has also been aided by integration of the administrative personnel. To the credit of those having the responsibility of meeting the affirmative duty imposed by *Green*[5] "to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch", the progress from the start has been rapid and far ahead of the plan set out in the May, 1963 order. No better proof of that could be offered than the prompt reaction of the school board to the *en banc* decision in Jefferson.[6] The opinion in that case was handed down in the spring of 1967, and the school board ordered that the entire school system be integrated with the beginning of the 1967 fall school term. Since that time, the school district has been operated as a bona fide unitary system, devoid of racial discrimination as to students, faculty, administrative staff and personnel, employees, athletics and other extracurricular activities and programs, and facilities. All that has been done smoothly and without fanfare through the earnest co-operation of members of all races, without hatred and the kind of trouble and turmoil that has been much too common in the past few years.

Prior to the time the plan for integration was adopted and ordered in May, 1963, the school district was operated under a dual system, with one group of schools designated specifically for white pupils and the other for Negroes. The keystone of that system was a set of attendance-zones for the Negro schools separate from the one for the white schools. The attendance-zone plan called for a pupil to attend the school provided for his race in the zone of his residence. The zones for the white pupils were determined by the factors generally accepted by educators as being for the best interests of school children.

If there had never been any *de jure* racial discrimination, those zones would have to be considered fair to all the pupils living therein. It was different as to the separate set of zones for children of the Negro race. The white pupils outnumbered them about 3 to 1, so there were fewer Negro schools and larger zones geographically. Although each set of zones, as a whole, covered the same total area, the boundaries of the individual zones for the Negro schools did not coincide with those for the white schools. The larger zones for the Negro schools overlapped the smaller zones for the white schools and sometimes covered several of them. One of the results was, to use the language of the plaintiffs' original complaint in this case, that Negro children were denied the right to attend the school "nearest their home on a non-segregated basis while non-Negro pupils are permitted to attend the school nearest their homes."

The school board did not adopt a narrow program built upon only one or two methods to discharge its duty of converting from a dual to a unitary system. It followed the course which has been since suggested in Henry v. Clarksdale Municipal Separate School District, 5 Cir., 409 F.2d 682 (1968), of using a combination of a number of accepted and approved methods: abolition of zones designed to carry on the dual system, attendance-zones not racially motivated, fair feeder patterns, liberal option and transfer policies, phasing out of schools having an overwhelmingly Negro attendance where facilities existed elsewhere for taking care of their pupils, integration of administrative executives and personnel and of faculties and other employees, and complete integration of all facilities and extracurricular programs.

The separate sets of schools for Negroes and whites and the attendance-zones provided for Negro children have been abolished. That left the attendance-zones which had been set up for the

---

5. Green v. County School Board of New Kent County, 1968, 391 U.S. 430, 88 S. Ct. 1689, 20 L.Ed.2d 716.

6. United States v. Jefferson County Board of Education, 5 Cir., 380 F.2d 385 (1967).

white pupils and which were for the best interests of all the school children, regardless of color, residing in the various zones. Where possible,[7] adjustments were made in the boundary lines of the school zones that remained. Since the beginning of the 1967 fall school term, each school has been open equally to all children residing in its zone, regardless of race or color.

Some of the schools which had a predominance of Negro pupils have been closed where provision could be made to take care of their pupils in schools attended primarily by white children. Those included elementary schools, middle schools and high schools.

The school district now operates 117 different schools, each of which falls within one of three classifications: elementary school (grades 1 through 5), middle school (grades 6 through 8), and high school (grades 9 through 12). To meet the problem of racial imbalance in areas where the residential situation has resulted in a predominance of Negro pupils, the school board adopted liberal option and transfer policies. They appear to be patterned after those set out in the decree in the *Jefferson* case, 380 F.2d at 390–393, and, at appropriate times, are brought to the attention of the students in person by the school authorities and to the parents by letter. They are also publicized in the newspapers in general circulation in the school district. For obvious reasons, the option policy applies *only* to children of middle and high school years, and not to those of elementary school age. On account of the tender years of such a child and the problems of getting him to and from school safely, he is, with two exceptions,[8] required to attend the elementary school in the zone in which he resides.[9] The plaintiffs have not objected to this policy as to children of elementary school age. Their position set out in their original complaint has constantly been that all such children, regardless of color, should attend the "nearest public elementary school to their said home". When a child completes his work in elementary school, he is given the option[10] of attending any one of two or more middle schools. Likewise when he has finished his courses in middle school, he has the option[11] to attend any one of three or more high schools. If the election is not to exercise the option, the feeder system sends him to the middle school designated for graduates of his elementary school or to the high school designated for graduates of his middle school, as the case may be. The middle schools and high schools embraced in the option available to children in any zone in the district, include schools where the child exercising the option can become a part of a student body composed predominantly, or in some cases about equally, of members of the opposite race.

The option policy is supplemented by a transfer policy under which a parent may make a request for transfer of his or

---

7. The location of the school buildings had to be taken into consideration in defining the zones. Most of the present school buildings were already in existence when this case was originally tried. The cost of replacing the 117 school buildings with new ones located on land to be acquired away from the present school grounds would be prohibitive and completely out of the question. In addition, in Texas, school buildings are constructed with funds secured from the sale of bonds voted by the qualified voters in the school district. It is difficult enough to carry a school bond election without the obstacles that would arise from a proposal to abandon a substantial portion of the schools.

8. The two exceptions are: (1) Where the school nearest his home is in an adjoining zone; and (2) where a transfer is granted at the request of his parent based on the best interest of the child.

9. A special effort has always been made to have each elementary school in the zones which now exist so located that it would not be over ½ to ¾ of a mile distant from the homes of any of its pupils.

10. This option is exercised by the parent.

11. This option must likewise be exercised by the parent.

her child to a school to which the child is not otherwise eligible, provided race,[12] color, whim or dislike of teacher is not the reason for the request. That policy has been liberally construed and applied. No request for the transfer of a Negro pupil from a predominantly Negro school to a predominantly white school has been denied. The transfer policy applies to school children of all ages.

The administrative personnel and the employees of the entire school system are completely integrated. 51 Negroes now hold important administrative positions. 84 of the 117 schools in the system have integrated faculties. There has been a marked increased along that line in the last two years; and the proportion of such integration is increasing currently in spite of the fact that the demand for qualified Negro teachers exceeds the supply on account of the keen competition for them from other schools and from industry. Two years ago, the school board employed Dr. Fitzwater as its Deputy Superintendent and gave him a large responsibility for the entire integration program. He is from the East Coast, and holds a doctor's degree in education from George Washington University, Washington, D. C. Prior to his engagement, the school administrators interviewed for employment as teachers the prospective graduates of only ten Texas colleges and universities. They are now conducting such interviews at more than forty colleges and universities all over the country each year, with special effort to get Negro teachers. Qualified ones are being offered contracts "on the spot".

There is no complaint about the integration of the extracurricular activities, or of the special programs such as night classes for adult education and the work with handicapped children. About two years ago, there was some apprehension about the football schedules, but a full evidentiary hearing disclosed that there was no basis for it and everyone was apparently satisfied. No question has been raised about any of the extracurricular programs since that time.

■ As matters stood at the close of the 1970 spring term, 26% (22,650 pupils) of the student body of the Fort Worth school system was Negro, 67% was Caucasian, and 7% was Mexican-American. 6460 Negro children (28% of the Negro pupils) attended schools that were all-white prior to desegregation. The evidence shows that some white children are attending schools that were formerly all-Negro, but no figures or percentages were given. In spite of the analysis and interpretation of statistics given by the plaintiffs' purported expert,[13] the evidence shows that there has been substantial, not just token, integration. HEW has never found anything wrong with the integration program. On the other hand, it has pointed to the Fort Worth system as a good example.

This present controversy probably would not have arisen except for the fact that the school board yielded to the pleas of the residents of the Morningside area of Fort Worth to build a new high school there. That brought on the present question about whether the dual system had been dismantled; but even then, as matters stood after a Saturday hearing of more than eight hours of evidence, with only two ten minute re-

12. This provision keeps a white parent from seeking to transfer his child from a school having a substantial number of Negro pupils.

13. The plaintiffs' chief witness was a local doctor. He purported to give expert statistical interpretation and analysis. He was not a statistician or an educator. The Court would have hesitated to admit his testimony except for the fact that the hearing was before the Court only. It appeared that the interpretation he was giving was prepared by him in concert with others who were not identified and whose qualifications were not shown. He was extremely biased and appeared more in the role of an advocate than of a witness. After considering the usual credibility factors, including his demeanor on the stand, the Court concluded that his testimony was not reliable and was entitled to little or no weight.

cesses, the plaintiffs really make no serious complaint about anything except the proposed construction of the new Morningside High School and the fact that Como High School and Kirkpatrick High School are predominantly Negro.

There are 15 high schools being presently operated by the school board. The student bodies of Como and Kirkpatrick are predominantly Negro. The situation is due to the fact that the residents of the areas where these schools have long been located are overwhelmingly Negro, rather than to design on the part of the school authorities. While the problem in connection with other formerly all-Negro schools has been worked out one way or another, it appears that the only answer to Como and Kirkpatrick is to phase them out. They were scheduled to be so phased out this year, but the school district just did not have the facilities to take care of their students. It is short on buildings,[14] even with Como and Kirkpatrick. However, under a resolution unanimously adopted by the board this spring, Como and Kirkpatrick will be phased out at the end of the present school year.

The residents of the Morningside area want the new high school there. Outside forces oppose it. The Morningside section lies east of the North-South Freeway and south of East Lancaster. It is a large area and the heart of it is a good sized residential addition known as Morningside. The addition is composed of substantial middle class or better residences which, until comparatively recently, were occupied entirely by whites. The dedication of the addition contained a restriction against conveyance of lots therein to Negroes. It was only after the decisions in the last few years holding such restrictions to be unenforceable that Negroes could get approved title to lots in the addition. They then started purchasing property in it and the addition changed from all white to predominantly Negro. In 1964, while the Morningside area was predominantly white, school bonds were voted for the construction of a high school there. There is not now, and there never has been, a high school in the area. By the time the bonds were processed and sold, the Morningside area was in a state of transition from predominantly white to predominantly black. After the integration of the entire system at the beginning of the 1967 fall school term, the black residents of Morningside began to insist that the board proceed to build the high school with the money on hand from the sale of bonds voted for it. The school board acceded. It bought the necessary land near the center of the area, and employed architects to prepare the plans, all at an expense of approximately $250,000.00.

The Court is of the opinion that the people of the Morningside area are entitled to the school. If they are regarded as just people, as they should be, without attention to race or color, no question could be raised about the propriety of the school. It cannot be reasonably said that the plan for and location of the school is racially motivated to serve a predominantly Negro community, when that community was predominantly white at the time the decision to locate and build the school was made. No question would have been raised about the school if the whites had continued to predominate in the area. If the whites were entitled to the school, why are the children and parents now living there not entitled to it, regardless of their color?

The high school children in the Morningside area now have the option to attend Paschal, Wyatt, Trimble Tech, Poly or Terrell high schools. Those schools encircle the Morningside area. The options will not be discontinued if the new school is built. The student bodies of Paschal and Wyatt are predominantly white. Poly is almost evenly divided as between whites and blacks. Trimble Tech draws a good representation from each of the races from all over the district because it is a comprehensive high

14. The district is using 483 portable classrooms at schools all over town, and it needs more.

school.[15] Terrell has more Negro students than whites. To reach these schools, pupils in the Morningside area have to travel from 2.5 to 3.7 miles.[16] Most of the travel is by bus. That is expensive, and the schedules are poor. At least one transfer is necessary in most instances. If a child misses the bus he is supposed to take, he is absent from school for almost half a day.

The advantages of a school in the area of its pupils' homes are well-known. Their pride and the pride of their parents in *their* school causes them to have pride in their work. The accessibility of the school—within walking distance of most of the pupils—decreases expense, inconvenience and dropouts. Many children who have to travel an unreasonable distance to school miss the extracurricular activities such as athletics, band, science clubs, etc., that take place after the close of classes for the day. The parents can participate in the PTA program, and come to feel that they have a voice in the school. The grown people in the area can benefit from the adult education program,[17] which, aside from its cultural advantages, equips them to make a better living. A high school is a community center, and the people in an area that is deprived of one miss something of real value.

The Court is of the opinion that with the kind of order which will be entered herein, the construction of the new high school will be no obstacle to the operation of a unitary and racially non-discriminatory system. To insure such an operation, the order will direct that Como and Kirkpatrick high schools be phased out at the end of the present school year and that no changes be made in the options available to the pupils in the Morningside area without approval of the Court given after a hearing following due notice to all interested parties.

This opinion will serve as the Court's findings of fact and conclusions of law. Judgment will be entered accordingly.

---

15. The school authorities here so designate it because, in addition to the regular high school courses, it offers a good vocational program especially useful to equip students to make a good living if they do not go to college.

16. The distances from the selected site of the proposed Morningside High School to the surrounding schools included in the option are: Poly, 2.5 miles; Wyatt, 2.9 miles; Paschal, 3.1 miles; Tech, 3.1 miles; Terrell, 3.7 miles.

17. The Fort Worth Schools have a good adult education program. It is held at night so that working people can attend. There are classes to equip persons to get employment in nutrition and various phases of office work.