**Arlene FLAX, et al.**

v.

**W.S. POTTS, et al.**

**Civ. A. No. 4205–E.**

United States District Court,
N.D. Texas,
Fort Worth Division.

Feb. 19, 1988.

Leon Haley, and Glenn O. Lewis, Fort Worth, Tex., for plaintiffs.

David B. Owen, Quillen, Owen & Thompson, Fort Worth, Tex., for defendants.

William L. Garrett, Dallas, Tex., for intervenors.

**MEMORANDUM OPINION
AND ORDER**

MAHON, District Judge.

This Opinion concerns the viability of a limited portion of the Fort Worth Independent School District's [FWISD] Desegregation Plan. The portion of the Plan in issue deals with the busing of 1233 elementary school students. After the 1983 amendments to the Desegregation Plan, this is all that remains of the number of students bused for desegregation purposes.

*In the Beginning: An End of a Caste System*

On May 17, 1954, the Supreme Court of the United States announced in *Brown v. Board of Education* that "in the field of public education the doctrine of separate but equal has no place."[1] The Court's

---

**1.** 347 U.S. 483, 495, 74 S.Ct. 686, 692, 98 L.Ed. 873 (1954) [hereinafter referred to a *"Brown I"*].

landmark decision did more than remove the stain of white supremacy from the nation's lawbooks and public dealings. It marked the beginning of a new era in civil rights and the end of an official caste system in this country.

Chief Justice Earl Warren wrote:

Today, education is perhaps the most important function of state and local governments.... It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms.[2]

An opportunity "to succeed in life"—not a guaranty of success, but more than a hollow concession. The linchpin of the *Brown* decision was the belief that laws which required or permitted a segregated school system not only isolated and humiliated black people, it kept them from moving as far as their ability, desire, and potential would allow.

On May 31, 1955, after hearing additional arguments on the relief to be accorded in the school desegregation cases, the Supreme Court in *Brown II* remanded the cases "to the District Courts to take such proceedings and enter such orders and decrees ... as are necessary and proper to admit [the plaintiffs] to public schools on a racially nondiscriminatory basis *with all deliberate speed....*"[3]

*Brown I & II: Fueling a Movement to Desegregate the School District*

On October 1, 1959, in the aftermath of the *Brown* decisions, Sergeant Weirleis

Flax, as next friend for his six-year-old daughter, Arlene, and Herbert Teal, as next friend of his six school age children, instituted this class action "to terminate a policy of racial segregation in the public schools within the Fort Worth Independent School District."[4]

On November 8, 1961, the *Flax* cause was tried before Judge Leo Brewster. It was his very first case. He sat without a jury; the trial lasted less than a day. In the opening pages of the transcript of this brief proceeding, the following exchange takes place between Weirleis Flax and his attorney regarding Flax's attempt to enroll his daughter in the Burton Hill Elementary School:

(Q) What did you announce to him [the principal] as your purpose for coming to that school?
(A) I told him that I would like to enroll Arlene in the school.
(Q) What response, if any, did you get?
(A) He said to me that he was very sorry but that he had no instructions to enroll Negro children in the school.
(Q) Did he tell you that was the reason you could not enroll her?
(A) That was the reason.
(Q) From whom did he say he had received the instructions?
(A) The school board.
(Q) And what specific reason did he give you for not enrolling her in that school?
(A) Because she was a Negro child.[5]

On March 1, 1962, Judge Brewster held that the "undisputed evidence fully supported the *defendants'* allegations ... about the operation of its school system under a policy of compulsory racial segregation."[6] The School District, in its verified answer, had asserted:

For more than 78 years Fort Worth Public Schools have been operated under a dual system for white and colored. This pattern of procedure has become a fundamental part of the educational pro-

---

**2.** *Brown*, 347 U.S. at 493, 74 S.Ct. at 691.

**3.** *Brown v. Board of Education*, 349 U.S. 294, 301, 75 S.Ct. 753, 757, 99 L.Ed. 1083 (1955).

**4.** *Flax v. Potts*, 204 F.Supp. 458, 460 (N.D.Tex. 1962).

**5.** Transcript of Proceedings, *Flax v. Potts*, November 8, 1961, No. 4025 at p. 6.
At the time the *Flax* lawsuit was brought, the School District was divided into "White" and "Negro" districts. The separation of the School District in this fashion resulted in a white or

black child similarly situated and qualified attending different schools. This was indeed the case with Arlene Flax who lived in an apartment complex on Carswell Air Base. Although there was a white school near her home, she had to travel a considerable distance to attend a school segregated for blacks. *Flax v. Potts*, 204 F.Supp. 458, 461 (N.D.Tex.1962).

**6.** *Flax*, 204 F.Supp. at 461 (emphasis added).
In fairness to the School District, it should be understood, that during the period in which this

cess in Fort Worth, and by experience, training and habit it is part of the culture of all the citizens both white and colored.[7]

Astonished by the Defendant's defensive theory, Judge Brewster wrote: "they defended upon the separate but equal doctrine, as if *Plessy v. Ferguson* were still the law."[8]

It was not. Judge Brewster entered a judgment "declaring that the dual racial system under which the Fort Worth schools was being operated violated the constitutional rights of the minor children named in the complaint and of the other members of their class...."[9] The Defendants were ordered to submit a plan for effectuating a transition to a racially nondiscriminatory school system by the next term, and they were permanently enjoined from obstructing or interfering with the plan's implementation. Judge Brewster retained jurisdiction over the case to ensure implementation. To this day, the School Board has not been free to act without federal supervision.

Judge Brewster approved the School District's "stair-step"[10] plan whereby the entire system was not desegregated at one time. During the 1963–64 school term, only the first grade in all schools and the adult education program were desegregated. During each school year after that session, the Court's desegregation order was applied "to one additional grade, proceeding from grade two to the twelfth grade, and last the kindergarten."[11] Judge Brewster opined:

> It is well known that there are adult extremists on both sides of the segregation issue who put their own prejudices ahead of the welfare of the school children and of the community. To desegregate kindergarten classes at the beginning, would make the small children pawns in the hands of those extremists.[12]

From 1963 to 1970, the School Board traveled alone in the integration process. It undertook its obligation slowly[13] and largely by the voluntary implementation of a self-designed integration plan. Little judicial intervention was sought.

*Using All the Remedial Tools: Swann & The End of a Segregated System*

---

litigation began, statutes existed in Texas which prohibited school boards from voluntarily submitting to integration. *See Boson v. Rippy,* 285 F.2d 43 (5th Cir.1961). Offending school districts became ineligible to receive their share of state school funds and lost their accreditation. Trustees were subject to a fine ranging from $100 to 1,000.

**7.** *Id.*

**8.** *Id.* at 461 (citations omitted).

**9.** *Flax,* 204 F.Supp. at 461.

Judge Brewster was affirmed on appeal. Only two issues were raised. The first was whether the class action was properly certified below, and the second was whether the Plaintiffs had exhausted their state administrative remedies. The Fifth Circuit Court of Appeals found both arguments without merit. Of the first, Judge Brown wrote: "It is perhaps ironic that it arises in a context in which on the substantive merits there cannot be the slightest doubt that the District Court's order was a moderate and restrained response to the imperative need for judicial action." *Potts v. Flax,* 313 F.2d 284, 286 (5th Cir.1963).

**10.** The "stair-step" plan was devised and approved by the Fifth Circuit Court of Appeals for the Dallas, Texas, school system. *See Boson v. Rippy,* 285 F.2d 43 (5th Cir.1961); *Flax v. Potts,* 333 F.Supp. 711, 713 n. 2 (N.D.Tex.1970) *rev'd on other grounds,* 450 F.2d 1118 (5th Cir.1971).

In 1963, the School District voluntarily accelerated the stair-step plan. During the 1963–64 term, all first grade and adult basic education classes were integrated. In the 1964–65 term, the integrated classes were expanded to include the kindergarten and second grade classes. In 1965, all elementary grades were integrated; in 1966, all middle schools. By 1967, all grade levels in the school system (kindergarten through grade 12) had achieved an integrated status.

**11.** *Flax v. Potts,* 218 F.Supp. 254, 256 (N.D.Tex. 1963).

**12.** *Id.* at 260.

**13.** The Plaintiffs had objected to the School Board's original 1963 plan on the ground that the suggested transition period was too long. *Flax v. Potts,* 333 F.Supp. 711, 713 (N.D.Tex. 1970). The Court modified the Board's plan to meet the Plaintiffs' objections. "The Plaintiffs apparently felt that the plan ordered met the requirements of that day, as they did not appeal from it." *Id.*

Complete implementation of the School Board's desegregation plan was quickened by the Fifth Circuit's decision in *United States v. Jefferson County Board of Education,* 380 F.2d 385 (5th Cir.1967). "The opinion in that case was handed down in the spring of 1967, and the school board ordered that the entire school system be integrated with the beginning of the 1967 fall school term." *Flax,* 333 F.Supp. at 714.

In 1970, however, a dispute arose over the construction of a high school in the Morningside area of Fort Worth. In addition to objecting to the construction of a new high school in a predominantly black area, the Plaintiffs moved the District Court for further relief, alleging that the 1963 desegregation plan had failed to eliminate the dual school system. Judge Brewster denied the motion.[14] He held that the school district had "been operated as a bona fide unitary system, devoid of racial discrimination as to students, faculty, administrative staff and personnel ..."[15] and that the "just people" of Morningside were entitled to their school.[16]

The Court of Appeals disagreed. The case was remanded with directions that the School Board implement a "student assignment plan and a faculty assignment plan that complies with the principles established in *Swann v. Charlotte–Mecklenburg Board of Education....*"[17] The School District was enjoined from constructing Morningside High School. In accordance with the Fifth Circuit's mandate, the School District submitted a desegregation plan on July 30, 1971 to the District Court. Judge Brewster approved the plan, but again the Plaintiffs objected, arguing on appeal that the plan fell short of full compliance with *Swann*.

Again, although this time with some hesitation, the Court of Appeals agreed.[18] It held:

> While the plan is effective in achieving a substantial amount of integration in

the Fort Worth Independent School District, it falls short of meeting the mandate of *Swann* that all vestiges of state-imposed segregation be eliminated from the public schools. This is because of the existence in the school system, during both the 1970–71 and 1971–72 school years, of 16 unjustified virtually all-black, one-race schools, relegating almost 12,000 of the approximately 21,000 black public school students in Fort Worth to a constitutionally proscribed segregated education.[19]

Again, the case was remanded with directions that the desegregation plan be modified.[20]

In accordance with the Fifth Circuit's directive, on August 23, 1973, a modified and comprehensive plan was entered and approved by the District Court. The modified Plan was amended to include the all-black schools in the clustering. Busing was increased, and affirmative desegregation devices such as majority-to-minority transfers were instituted. The faculty assignments in each school were required to reflect the ratio of white to black teachers in the School District as a whole; only a 12% variance of this ratio requirement would be tolerated in any school. The School District was ordered to submit biannual reports containing detailed racial data for each school.

From 1973 to 1983, additional modifications and revisions were made to the desegregation plan.[21] The faculty assignment

---

14. *Flax,* 333 F.Supp. at 714.

15. *Id.*

16. *Flax,* 333 F.Supp. at 717.

17. *Flax v. Potts,* 450 F.2d 1118, 1118–19 (5th Cir.1971). The *Flax* case was of many remanded to the lower Courts following the Supreme Court's decision in *Swann.*

In *Swann,* the Supreme Court carefully examined the broad range of alternatives open to a court to eliminate the last vestiges of a school system long segregated by law. Given a past history of such segregation, if it is possible to identify a white or a black school "simply by reference to the racial composition of teachers and staff, the quality of school buildings and equipment, or the organization of sports activities, a *prima facie* case of violation of substantive constitutional rights under the Equal Protection Clause is shown." *Swann v. Charlotte–Mecklenburg Board of Education,* 402 U.S. 1, 18, 91 S.Ct. 1267, 1277, 28 L.Ed.2d 554 (1971).

18. The Court of Appeals commended the Superintendent and the School Board for "good faith voluntary efforts to desegregate and eliminate inequality in the school system." *Flax v. Potts,* 464 F.2d 865, 866 (5th Cir.1972). The Court continued: "On the other the hand, the appellants' [Plaintiffs'] objections have been numerous but their contributions negligible. We must, nevertheless, once again remand the case because the record affirmatively shows that the plan has not yet fully established a unitary school system." *Id.* at 866.

19. *Flax,* 464 F.2d at 866.

20. The School District unsuccessfully sought an appeal to the Supreme Court of the United States. On November 13, 1972, the School District's Writ of Certiorari was denied. *Potts v. Flax,* 409 U.S. 1007, 93 S.Ct. 433, 34 L.Ed.2d 299 (1972).

21. In 1975, this action was transferred from Judge Brewster's docket to the docket of this Court.

ratio was modified to allow only a 10% variance. Magnet schools were implemented as a desegregation tool. The Mexican–Americans, who Judge Brewster permitted to intervene in this suit in 1971, were recognized as a separate ethnic minority. They entered into an affirmative action agreement with the School District to protect and to further the special needs of the Mexican–Americans.

*The 1983 Amendments: Maximizing Swann's Remedial Tools*

. In 1983, the parties presented a Joint Motion to the Court seeking approval of numerous amendments to the School District's Desegregation Plan.[22] The 1983 Amended Plan was prepared by a Citizens' Advisory Committee. The Committee consisted of eleven members; one member was selected by each of the nine members of the school board, two were named by both the Plaintiffs and the Mexican–American Intervenors. The Committee's proposals were the result of a delicate and arduous process: change effected through both citizen participation in governmental affairs and a rational appeal to elected officials.

The Committee obtained input from the general public regarding possible changes to the School District's Desegregation Plan. It cooperated with the School Board, but its independence was never compromised. The Committee secured the consensus of *all* parties to this litigation that its proposals were a workable and effective solution to the difficult and perplexing task of revising the then-existing Desegregation Plan. The Committee submitted its proposed Amended Plan to the School Board, and with few minor revisions, the Board voted to submit the Plan to this Court for approval. On June 17, 1983, the Court, itself having made a few moderate changes, approved the Amended Plan.

The Committee consulted the Plaintiffs and asked what ratio of majority-to-minority students would be required to consider a school naturally-integrated. The Plaintiffs responded that a 20% to 30% minority population could reasonably be considered a naturally-integrated school. With certain adjustments to school attendance zones, the Committee found that thirty neighborhood schools could be considered "stand-alone" or naturally integrated. This resulted not only from redrawing the attendance zones but also from the drastic change in residential housing patterns in Fort Worth. In fact, the Committee found that the Plan in existence at the time the Amendments were sought actually undermined the natural integration process.

Based on the evidence adduced at the 1983 hearing, the Court found:

> In striking comparison, there are only *three* stand-alone schools under the present desegregation plan. It became apparent ... that the present desegregation plan, which is based on the demographics of the city ten years ago, has required busing in numerous instances where *blacks* have been bused along with whites *out* of their own naturally-integrated neighborhood into a predominately *black* school for the purpose of integration. Likewise *whites* have been bused along with blacks *out* of their own naturally-integrated neighborhood into a predominately *white* school for the purpose of integration.[23]

The Citizens' Advisory Committee also recognized that certain underutilized or older schools could be closed. The Court found that the Committee's recommended school closings, not only reduced the school system's operating expenses, but contributed to the natural integration levels of the stand-alone schools. As a result, five elementary schools in predominately white areas were closed; two in predominately black neighborhoods; and, two in mixed neighborhoods.[24]

The Advisory Committee's work did not end there. They reexamined the School District's use of all desegregation tools. In this respect, the Committee proposed a revised "clustering" and "pairing" of schools not yet declared "stand-alone." The Committee's recommendations not only improved majority-minority ratios at various clustered schools, it achieved a remarkable and desirable result: each child, whether a member of the majority or minority races, would bear an equal burden in busing and be bused no more than one year. Despite the Court's attempt to form a different pattern of clustering and pairing in the hope of formulating even a better plan, none could be devised. The Court deferred to the Committee's excellent work in this regard.[25]

---

22. *Flax v. Potts,* 567 F.Supp. 859 (N.D.Tex.1983).

23. *Flax,* 567 F.Supp. at 864.

24. *Flax,* 567 F.Supp. at 867.

25. *Flax,* 567 F.Supp. at 868.

As a result of the Committee's proposals, thirty schools in the system were designated "stand-alone," twenty were paired and clustered. Only eight elementary schools remained which were neither stand-alone or clustered and which contained a disproportionate enrollment of minority race students. Five of those schools had predominately Hispanic populations, three were predominately black. "[T]he evidence before the Court suggest[ed] that changing demographics and housing patterns have caused the one-race concentrations, rather than any action on the part of school au-'thorities." [26] The Court concluded that the racial imbalance was "not the result of present or past discriminatory action on the part of the FWISD." [27]

The 1983 Advisory Committee proposed a "pyramid feeder system." Under this system, elementary schools "fed into" designated middle-schools, middle-schools "fed into" designated high schools. Many educational, disciplinary, and social benefits were found to derive from this proposal where, with few exceptions, students in given elementary schools will go to the same middle school and students in given middle schools will go to the same high school. [28] To successfully implement the "pyramid feeder system," some secondary school boundary lines had to be adjusted. Gerrymandering was a reasonable, moderate, and necessary device to reap the essential benefits of the pyramiding program.

Under the 1983 Amended Desegregation Plan, there was a seventy-five percent reduction in the number of students bused for desegregation purposes. The number of students bused for desegregation purposes reached its peak during the 1981–82 school term. During that term, 9,510 students were bused. In the school year immediately preceding the 1983 amendments, 8,754 students were transported from their neighborhoods to schools in other areas to further integrate the School District. When the Plan was amended in 1983, the number of students bused was reduced to 1,679. Cluster routes were also substantially lowered in number from 167 to 32.

In 1983, the Court found, and the parties to this litigation agreed, that this reduction in busing furthered desegregation efforts. [29] Reduced busing rewarded those neighborhoods which had become naturally integrated. It alleviated black students of the burden of being bused for a substantially longer period, three to five years, while other students, primarily white, were bused for a markedly shorter time, one to two years. Under the Amended Plan, all children who were bused were done so for only one year.

The impetus of the 1983 Amended Desegregation Plan was "quality education." [30] The implementation of the Plan resulted in a savings of 1.5 million dollars. Forty-percent of this savings was channeled to minority schools to reduce class sizes, employ counselors, and fund the creation of an instructional specialist position. Under the Amended Plan, the School District's transfer policy was also strengthened. Finally, the Court increased the biannual and annual reporting requirements of the School District to include specific racial data and achievement reports of students enrolled in high minority or magnet schools.

On June 17, 1983, the Court approved and adopted the 1983 Amendments to the School District's Desegregation Plan. From then until 1987, the School District once again travelled alone. The Amended Plan was implemented without incident and has worked effectively; only minor modifications have been required. On July 10, 1987, on its own motion, the Court requested that a hearing be held "to review only that portion of the present Desegregation Plan which deals with the busing of second and third grade students at 19 elementary schools." [31]

### The Last Vestige of a Remedial Tool: How Viable is Busing?

■ This lengthy historical explication of a case, now almost 30 years old, might not have been necessary were it not for the lack of historical perspective that is an American trait and the conventional wisdom that governmental efforts to solve social problems are doomed to failure. A full generation has passed since the *Brown* and original *Flax* decisions. Black and

26. *Flax,* 567 F.Supp. at 871.

27. *Id.*

28. *Flax,* 567 F.Supp. at 871.

29. *Flax,* 567 F.Supp. at 872.

30. *Flax,* 567 F.Supp. at 859.

31. Order dated July 10, 1987, *Flax v. Potts,* Civil Action No. 4205–E, at p. 4.

white children born in 1959 are now adults; many with children of their own. Few recognize how deeply entrenched were the roots of the segregated school systems, not just in economic but in emotional terms, and at what cost in effort and persistence the elimination of the old order was purchased. This historical perspective may make some pessimistic about the possibility of eradicating racism.[32] Yet, a review of the Fort Worth Independent School System Desegregation Plan encourages the belief that even seemingly intractable problems can yield to citizen action through government.

As ordered, the hearing to review busing as a proper remedial measure to integrate the FWISD was held on December 7–8, 1987. As the end of busing may effect the racial balances in some schools within the system, the Defendant School District bore the burden of proving that the "racial composition is not the result of present or past discriminatory action on their part."[33] The School District presented documentary evidence and two witnesses in support of its plea that the last vestige of busing end. The Plaintiffs presented no evidence of their own in opposition to the School District's request; they merely cross-examined the School District's witnesses.

Dr. Edwin Dan Powell, Jr., Assistant Superintendent of Schools, and Dr. Don R. Roberts, Superintendent of Schools testified. Based upon the testimony of these witnesses and the documentary evidence adduced, the Court makes the following fact findings.

The Fort Worth Independent School District is the third largest in Texas. It ranks in size with the top 50 school districts in the country. In 1970, the FWISD had a total student population of 88,094. Of these, 56,437 (64%) were white, 23,542 (27%) were black, 8,115 (9%) were Hispanic. As of the date of hearing, December 7, 1987, the School District's total student population was markedly lower. More than 20,000 fewer students were enrolled; the total student population was now 67,347. Of these, 24,468 (36%) were white, 24,331 (36%) were black, 16,742 (25%) were Hispanic, and 1,806 (3%) were of other races, principally Indian or Oriental. There are 105 schools in the District. Sixty-one (61) of these are elementary schools and 19 are clustered and paired for desegregation purposes. Currently, only second and third grade students who attend these 19 "clustered" schools are bused. As of the date of the hearing, this involved 1233 students.

Among the 19 clustered schools, 8 are located in predominately black neighborhoods. They are: Morningside, D. McRae, Pate, Como, Walton, Van Zandt–Guinn, Williams, and Carroll Peak. These schools receive second grade students from all 19 schools. The other 11 schools are located in neighborhoods which are becoming increasingly integrated. They are: Merrett, Waverly Park, Westcreek, Stevens, Phillips, Ridglea Hills, Tanglewood, South Hills, Shulkey, Western Hills, and Benbrook. These schools receive third grade students from all 19 schools.

The racial breakdown of the enrollments of the 19 elementary schools *with* cluster busing is presented on the following chart. The numbers contained in parentheses indicate the projected racial population *without* cluster busing. The percentages presented in the far right-hand column is the corresponding percentage of the dominant race in each school; the net change in the racial composition is also expressed as a percentage.

| School | Racial Population In Number | | | | | | Dominant Race | | |
| | Black | | Hispanic | | White | | % | (%) | Net |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Morningside | 737 | (798) | 25 | (22) | 210 | (135) | 75 | (82) | 7% |
| D. McRae | 438 | (474) | 262 | (284) | 148 | (86) | 51 | (56) | 5% |
| J.T. Stevens | 148 | (93) | 27 | (30) | 579 | (679) | 71 | (80) | 9% |
| Mary Phillips | 37 | (40) | 46 | (52) | 236 | (268) | 72 | (73) | 1% |
| Luella Merrett | 71 | (46) | 47 | (49) | 308 | (351) | 71 | (77) | 6% |
| South Hills | 65 | (45) | 116 | (121) | 323 | (355) | 64 | (68) | 4% |
| Ridglea Hills | 57 | (53) | 28 | (31) | 349 | (416) | 80 | (82) | 2% |

32. *See* Black, *The Lawfulness of the Segregation Decisions,* 69 Yale L.J. 421 (1960) (segregation was a "massive intentional disadvantaging of the Negro race" by state law).

33. *Swann v. Charlotte–Mecklenburg Board of Education,* 402 U.S. 1, 26, 91 S.Ct. 1267, 1281, 28 L.Ed.2d 554 (1971).

| School | Racial Population In Number | | | | | | Dominant Race | | |
|---|---|---|---|---|---|---|---|---|---|
| | Black | | Hispanic | | White | | % | (%) | Net |
| Waverly Park | 51 | (15) | 20 | (21) | 267 | (299) | 78 | (88) | 10% |
| Tanglewood | 82 | (26) | 8 | (10) | 228 | (271) | 71 | (86) | 15% |
| A.M. Pate | 452 | (506) | 5 | (2) | 81 | (1) | 82 | (99) | 17% |
| Bruce Shulkey | 108 | (70) | 45 | (43) | 366 | (397) | 68 | (74) | 6% |
| Como | 523 | (580) | 37 | (26) | 154 | (12) | 73 | (93) | 20% |
| V. Williams | 386 | (419) | 59 | (52) | 43 | (27) | 78 | (83) | 5% |
| M. Walton | 297 | (317) | 21 | (16) | 32 | (0) | 85 | (95) | 10% |
| Van Zandt | 368 | (406) | 38 | (40) | 43 | (12) | 80 | (80) | 8% |
| Benbrook | 145 | (40) | 29 | (29) | 570 | (614) | 70 | (81) | 11% |
| Carroll Peak | 776 | (881) | 19 | (2) | 59 | (15) | 90 | (96) | 6% |
| Western Hills | 129 | (96) | 43 | (50) | 289 | (305) | 59 | (64) | 6% |
| Westcreek | 167 | (131) | 103 | (81) | 624 | (686) | 66 | (72) | 6% |

In the 11 schools whose second grade students were transported out of their neighborhoods during the 1987 term, 43% of the prior year's first grade students did not re-enroll in the FWISD. Put differently, only 57% of the first graders that sit in a spring classroom returned in the fall to schools they were intended to integrate. The implication is that these students were transferred to private schools or that they were relocated, along with their parents, to other school districts. No similar pattern existed in schools where no busing occurred.

Currently, 674 students are bused away from 11 substantially integrated neighborhoods. Of these students, 13% are black. From the 8 predominately black neighborhoods, 559 students are being bused; 4% of these students are white. Oddly, busing as a remedial tool under the current Desegregation Plan results in white children being bused away from predominately black neighborhood schools; conversely, some black children are bused in. Though the percentages are admittedly small, the irony exists.

Busing has a minimal impact on the racial composition of the 8 predominately black schools in the cluster of 19. Less than 10% of the students in these predominately black schools are bused-in white students.[34] If busing is discontinued, the total increase of black students in all 8 predominately black schools is 405 out of a total enrollment of 5,156 students.

The type of busing utilized for the cluster of 19 schools is "cross-town" busing. Appendix A appears at the end of this Opinion and presents detailed information regarding the time and distance second or third grade students attending the cluster schools must travel. The longest one-way distance from one clustered school to another is 13.8 miles. To make the round trip to and from a school this distance away, at least one student must ride the bus on a given day for more than 3 hours, or 195 minutes.

The shortest distance travelled by any student bused is 2.3 miles. Yet, for at least one student on the "short trip," the round trip lasts more than an hour. The shortest time any student in the busing program must travel is twenty minutes. The Court's rather rough calculations indicate that the average one-way trip for any student bused is 9.3 miles; the median round trip ride lasts little more than an hour, or approximately 65 to 70 minutes. Bus transportation also takes its toll in terms of manpower and expense. As indicated by Appendix B, the busing program currently utilized by the School District to promote desegregation in 19 elementary schools costs $175,573 annually to operate.

During the period that busing has been used as a remedial tool, the racial composition of the School District has changed radically. In 1970, there were 56,437 white students; they comprised 64% of the total student population. At the present time, white students are 26,274 in number, a figure much lower than that of 1970, and now account for only 36% of the student population. There are 32,000 fewer white students now than there were in 1970, while the *number* of black has remained relatively constant. It should be noted, however, that the *percentage* of black stu-

---

**34.** Out of a total enrollment of 5,271 students in these eight schools, 501 white students are transported in.

dents has increased, from 26.7% in 1970, to 36% at the present time. This percentage increase in the black student population results from decreasing white enrollments.[35]

The School District contends that busing in the FWISD has lost its effectiveness as a desegregation tool and contributes little to actual integration. The School District believes that, at this time in the history and development of its Desegregation Plan, busing has a negative impact on the educational opportunities of all students bused. This is particularly true, says the School District, in the area of parental involvement and after-school student activities. The School District suggests that because of this limited busing families have chosen to reside in school districts adjacent to FWISD which do not have similar desegregation programs. To support this conclusion, the School District points to the 1980 census which shows a substantial increase in the population of Tarrant County while that of Fort Worth declines.

### Matching a Remedy to Fit the Scope of the Wrong

Equity jurisprudence is replete with maxims designed to aid judges in fashioning remedies. The nature of the violation, we are told, determines the scope of the remedy. The purpose of a remedy, it is said, is to restore the person wronged to the position he would have occupied but for the commission of the wrong. But how does one remedy a violation consisting of a state enforced dual school system which subjected a class of people to conditions of isolation and deprivation for almost a century?

Over the past two decades in this case, the Court has opted for affirmative redress, that is, the implementation of remedies urged by the Plaintiffs that would change their practical situation, not merely their formal position in the eyes of the law. The objective has been to "eliminate from the public schools all vestiges of state-imposed segregation."[36] The remedy has been a common sense approach to "achieve the greatest possible degree of actual desegregation...."[37] Courts have recognized that "no *per se* rule can adequately embrace all the difficulties of reconciling the competing interests involved...."[38]

This Court, however limited, must once again attempt to make a fair and equitable reconciliation of the parties' "competing interests." Given the minimum impact that the eradication of busing 1233 second and third grade students will have on the racial composition of the School District as a whole, the disadvantage and inconvenience posed by this limited remedial measure outweighs its benefits, if any. The School District has met its burden of proving that any effect that the termination of busing may have upon the racial complexion of its schools is "genuinely nondiscriminatory."[39]

The number of students currently being bused represents less than 2% of the School District's total student population. When viewed from this perspective, the termination of busing poses no threat to the overall effectiveness of the School District's Desegregation Plan.

In at least 5 cluster schools, it is true that the end of busing will increase by more than 10% the number of students in the predominate race.[40] While this Court must "scrutinize" this increase to ensure that it is not the result of "present or past discriminatory action,"[41] there is no constitutional mandate that each school in the system reflect the racial composition of the School District as a whole.[42] Neither is there a duty "to make year-to-year adjustments"[43] of the racial make-up of each school once the system is desegregated and the policy of segregation eliminated.

---

35. *See* Appendix C attached.

36. *Swann v. Charlotte–Mecklenburg Board of Education,* 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971).

37. *Swann,* 402 U.S. at 26, 91 S.Ct. at 1281.

38. *Swann,* 402 U.S. at 26, 91 S.Ct. at 1281.

39. *Id.* at 26, 91 S.Ct. at 1281. *See also Dowell v. Board of Education,* 795 F.2d 1516, 1523 (10th Cir.1986) ("The defendants, who essentially claim that the injunction should be amended to accommodate neighborhood elementary

schools, must present evidence that changed conditions require modification or that the facts or law no longer require the enforcement of the order.").

40. *See supra* p. 827 (racial population chart).

41. *Swann,* 402 U.S. at 26, 91 S.Ct. at 1281.

42. *Id.* at 24, 91 S.Ct. at 1280.

43. *Id.* at 32, 91 S.Ct. at 1284.

Communities in a mobile society are not demographically stagnant.[44] Based on the testimony adduced at the hearing [45] and considered as a whole, the evidence strongly suggests that the racial composition in most of the neighborhoods where the 19 clustered elementary schools are located has changed or fluctuated since the Desegregation Plan became fully implemented and constitutionally operative in the early 1970's. Thus, any racial imbalance in these schools is not the result of past segregative practices but of changes in residential housing patterns. In those areas where the racial complexion of the neighborhood has not changed significantly, busing 501 white students into these 8 predominately black schools does little to alter their racial composition. Indeed, the termination of busing would increase the black student population of these schools by less than 8%.[46]

Accordingly, the Court finds no discriminatory purpose on the part of the School District in seeking to eliminate busing, nor does its elimination have a constitutionally prohibited, discriminatory effect. "[S]chool Officials who have taken effective action have no affirmative fourteenth-amendment duty to respond to the private action of those who vote with their feet." [47]

Busing is merely one device of many employed by both the Court and the School District to further desegregation. Effective majority-to-minority transfer and magnet programs also exist and are in place to ensure that racial discrimination is eliminated "root and branch." [48] Under the majority-to-minority transfer policy, any student enrolled in a school in which his race is in the majority can simply make a request and be given a transfer to any other school in which his race is in the minority. Thus, no black student is locked into any predominately black school; conversely, no white student is locked into any predominately white school. Transportation to transferring students is provided free by the District. A majority-to-minority transfer is a matter of right under the current Desegregation Plan. Transfers are not contingent upon the approval of some designated official. A formal request is all that is required.

The Magnet program is another tool which operates to ensure that segregation and its vestiges are eliminated. At the Court's direction, magnet schools are always in predominately minority neighborhoods. The concept of these schools is twofold: (1) to offer a specialized instructional package which attracts students from all over the district, and (2) to further integrate the schools which are part of the magnet program. Among the 19 elementary schools clustered and paired for desegregation purposes, magnet programs current-

---

**44.** *See Ross v. Houston Independent School District,* 699 F.2d 218, 225 (5th Cir.1983). *See also Swann,* 402 U.S. at 23, 91 S.Ct. at 1279 (court's objective "does not and cannot embrace all the problems of racial prejudice, even when those problems contribute to disproportionate racial concentrations in some schools.").

**45.** The Court refers to the hearing held on the issue whether that section of the Desegregation Plan which deals with busing 1233 elementary school students should be eliminated. The hearing was held on the 7th and 8th of December, 1987.

**46.** If busing is discontinued, the total increase of black students in all 8 predominately black schools is only 405 out of a total enrollment of 5,156 students in all 8 schools.

**47.** *Ross v. Houston Independent School District,* 699 F.2d 218, 225 (5th Cir.1983) (citing *Pasadena City Board of Education v. Spangler,* 427

U.S. 424, 434–36, 96 S.Ct. 2697, 2704–05, 49 L.Ed.2d 599 (1976)). *See also Morgan v. Nucci,* 831 F.2d 313 (1st Cir.1987). In *Morgan,* the number of one-race schools in Boston did not preclude a finding of a unitary school system. The Court found that although 13 one-race schools existed:

It would be illogical to use the racial identifiability of such schools as a reason for continuing a plan which can only offer more the same.... We must presume that racial imbalance in the 13 schools is rooted not in discrimination but in more intractable demographic obstacles.

*Id.* at 321. *See also Riddick v. School Board of the City of Norfolk,* 784 F.2d 521, 534–35 (4th Cir.1986); *Higgins v. Board of Education of City of Grand Rapids,* 508 F.2d 779, 794–95 (6th Cir.1974).

**48.** *Green v. New Kent County School Board,* 391 U.S. 430, 438, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968).

ly exist at two of these schools, Morningside (math and science), and D. McRae (language). The William James Elementary School, not contained in the cluster, also has a magnet program. All of these programs are working well. Additionally, the Como Montessori School was also begun in the fall of 1986, and involves students from the Como Elementary School. A substantial number of black students have elected to attend these special magnet programs.

When evaluating the School District's use of all reasonable and available desegregation tools, it is worth re-emphasizing that, since the time the comprehensive Desegregation Plan was approved in 1973, faculty assignments to individual schools have been required to reflect the ratio of white to black teachers in the District as a whole. This ratio requirement was never permitted to vary by more than 12%. Upon this Court's Order, the tolerance level was reduced further to allow a variance of no more 10%. An integrated faculty helps to ensure that all children, regardless of race, have equal access to educational opportunities and that the educational opportunities received are substantially the same for all children similarly situated.

It must be noted, too, that since the desegregation process began, blacks and other minorities have assumed positions of responsibility within the school system.[49] Most notable is the fact that in 1978 a change was mandated in the manner in which members of the School Board of Trustees were elected. In that year, a bill was enacted by the Texas legislature which provided for the election of seven of the nine School Board members by a popular vote within the single-member districts in which they resided.[50] Two Board members continued to obtain their office by the popular vote of the school system at large. As a result of this change in Trustee elections, the School Board has become increasingly integrated. Three Trustees are members of a minority race; two of these three are black. An integrated School Board ensures that decisions concerning school funding and administrative policy are made on a neutral and nondiscriminatory basis.

In light of the effectiveness of the majority-to minority transfer policy, magnet programs, faculty assignment ratios, and School Board integration, busing 1233 students contributes little to the School District's Desegregation Plan when weighed against the burden it places upon the students bused and their parents. Busing creates an obvious distance barrier between families and the schools their children attend. Parents must travel additional distances to confer with instructors, respond to emergencies, or attend parent-teacher meetings.

The children suffer too. Often, children transported long distances to school must awake earlier, get home later, and sometimes wait or arrive in the dark. Children bused for desegregation purposes frequently miss out on after school activities; or if they participate, their parents are required to travel greater distances in order for them to participate. Balanced against this disadvantage and inconvenience, the desegregative effect of busing in this District is simply not worth the ride.

### The Movement Toward Unitary Status

Busing is but one remedial measure set forth in *Swann.* The techniques outlined in that case are permissive, not mandatory.[51] Strangely enough, busing at one time was used to promote segregation. Ironically, its use was later reversed, and it became an invaluable desegregation device. Like the segregative practices that it once sought to eliminate, busings' day has passed. As a vital tool for more than 15 years, it has served the School District well. But the construction of a unitary system does not require that each school

---

**49.** *See Morgan v. Nucci,* 831 F.2d 313, 321 (1st Cir.1987) (racial integration of school board made discriminatory funding unlikely).

**50.** *See* Tex.Educ.Code Ann. § 23.023 (Vernon 1987).

**51.** *Swann v. Charlotte–Mecklenburg Board of Education,* 402 U.S. 1, 30, 91 S.Ct. 1267, 1283, 28 L.Ed.2d 554 (1971).

have an equal racial balance.[52] "What is required is that every reasonable effort be made to eradicate segregation and its insidious residue." [53] In this School District, post-desegregation demographic changes renders the use of busing an unreasonable attempt to achieve a complete homogenization of all student bodies. When viewed in this light, busing no longer acts as a meaningful aid to the Court in fashioning a remedy for, perhaps, what are now the unmeasurable sins of the past.

As the School District moves toward a declaration of unitary status, this Court will continue to play a crucial role in ensuring that every student's educational opportunity is the same—hence, the guarantee that they will indeed have an equal "opportunity to succeed in life." [54] These assurances are not formalistic concessions. They are the driving force of the desegregation process.

The judiciary remains the monitor of the integrity for this political and highly emotional process.[55] The response of the parties and the community to court-supervised desegregation has been both cooperative and encouraging for many years. In all

likelihood, the Court will once again be asked to re-examine the Desegregation Plan to ensure that all available desegregating tools are fully maximized.

While striving to construct our unitary system, no doubt there will emerge warring instincts of hope and fear, generosity and meanness—instincts that reside in each of us. The political leadership that responds to these instincts will likewise emerge. Undoubtedly, the Court will have to perform its reconciliatory task again.[56] If it performs this task wisely, only our better natures will prevail.

## ORDER

Accordingly, it is ORDERED that the remaining portion of the FWISD Desegregation Plan which deals with the busing of second and third grade students at 19 elementary schools be eliminated at the beginning of the 1988–89 school year. Monies saved by the elimination of busing for desegregation purposes are to be designated "Quality Funds" and used as provided in the 1983 Amendments to the FWISD Desegregation Plan.

---

**52.** *Ross v. Houston Independent School District,* 699 F.2d 218, 227–28 (5th Cir.1983) (citing *Swann,* 402 U.S. at 24, 91 S.Ct. at 1280; *Horton v. Lawrence County Board of Education,* 578 F.2d 147, 151 (5th Cir.1978); *United States v. Tuscaloosa City School System,* 576 F.2d 39, 41 (5th Cir.1978)).

**53.** *Ross,* 699 F.2d at 228.

**54.** *Brown v. Board of Education,* 347 U.S. 483, 495, 74 S.Ct. 686, 692, 98 L.Ed. 873 (1954).

**55.** Leon Higginbotham, Jr., Judge of the United States Court of Appeals for the Third Circuit, recently spoke to the members of the Harvard Law Review and eloquently said:

Poverty, hatred, malnutrition, inadequate health care and housing, corruption in government, and the failures of our public school system continue to haunt us today because those in power often have lacked personal morality or have failed to make real the

values that they have professed to hold in the abstract. To paraphrase Justice Holmes, the life of the law must not be mere logic; it must also be values. Each lawyer—whether judge or politician, professor or entrepreneur—must make personal judgments. Those critical moral and human values cannot be acquired by even the most meticulous reading of opinions or statutes. Each lawyer must consciously and constantly assess his or her values and goals in forging rules of law for the future.

Higginbotham, Jr., *The Life of the Law: Values, Commitment, and Craftsmanship,* 100 Harv.L. Rev. 795, 815 (1987).

**56.** "The reconciliation of competing values in a desegregation case is, of course, a difficult task with many sensitive facets but fundamentally no more so than remedial measures courts of equity have traditionally employed." *Swann v. Charlotte–Mecklenburg Board of Education,* 402 U.S. 1, 31, 91 S.Ct. 1267, 1283, 28 L.Ed.2d 554 (1971).

## APPENDIX A

### FORT WORTH INDEPENDENT SCHOOL DISTRICT
### MILEAGE BETWEEN SCHOOLS
### FOR CLUSTER BUSING

| SCHOOL TO SCHOOL | ONE–WAY SCHOOL TO SCHOOL DISTANCE | LONGEST RD. TRIP RIDE | SHORTEST RD. TRIP RIDE | MEDIAN RD. TRIP RIDE |
|---|---|---|---|---|
| #7, Morningside | | | | |
| #38, Merrett | 11.3 miles | 119 min. | 56 min. | 86 min. |
| #65, Waverly Pk. | 13.8 | 195 | 32 | 72 |
| #20, D. McRae | | | | |
| #86, Westcreek | 10.5 | 127 | 42 | 58 |
| #67, A.M. Pate | | | | |
| #45, Stevens | 13.8 | 143 | 62 | 122 |
| #73, Como | | | | |
| #47, Phillips | 2.3 | 115 | 20 | 50 |
| #58, Ridglea Hills | 2.9 | 86 | 10 | 60 |
| #66, Tanglewood | 2.8 | 79 | 26 | 46 |
| #75, Williams | | | | |
| #85, Western Hills | 10.3 | 115 | 32 | 50 |
| #78, Walton | | | | |
| #54, South Hills | 12.0 | 58 | 40 | 48 |
| #79, Van Zandt-Guinn | | | | |
| #68, Shulkey | 9.0 | 122 | 40 | 78 |
| #82, Carroll Peak | | | | |
| #80, Benbrook | 13.4 | 134 | 60 | 82 |

---

### APPENDIX B

**Fort Worth Independent School District**
**Transportation for Integration Clusters**
Fall, 1987

| | |
|---|---|
| Routes: | 35 |
| Full-time Equivalent Buses: | 20 |
| Miles Traveled: | 142,257 annually |
| Driver Time: | 8,960 hours |
| Driver Cost: | $66,035.00 annually |
| Mileage Cost: | $247,527.00 annually |
| Total Cost: | $313,562.00 annually |
| State Reimbursement: | $137,989.00 annually |
| FWISD Cost: | $175,573.00 annually |

sh
11–17–87

| Year | Anglo/Other | Hispanic | Black | Total |
|---|---|---|---|---|
| 1974 | 41,493 | 9,420 | 24,907 | 75,820 |
| 1975 | 39,830 | 9,675 | 25,008 | 74,513 |
| 1976 | 36,701 | 9,682 | 24,286 | 70,669 |
| 1977 | 34,649 | 10,311 | 24,871 | 69,831 |
| 1978 | 32,880 | 10,569 | 24,761 | 68,210 |
| 1979 | 31,295 | 11,056 | 24,470 | 66,821 |
| 1980 | 30,262 | 11,638 | 24,125 | 66,025 |
| 1981 | 29,086 | 12,369 | 23,951 | 65,406 |
| 1982 | 28,704 | 12,799 | 23,622 | 65,125 |
| 1983 | 27,982 | 13,313 | 23,677 | 64,972 |
| 1984 | 27,000 | 13,909 | 23,380 | 64,289 |
| 1985 | 27,113 | 15,214 | 24,046 | 66,373 |
| 1986 | 26,979 | 16,154 | 24,139 | 67,272 |
| 1987 | 26,274 | 16,742 | 24,331 | 67,347 |

sh
11–17–87

### APPENDIX C

**Fort Worth Independent School District Fall**
**Enrollments by Ethnic Groups**

| Year | Anglo/Other | Hispanic | Black | Total |
|---|---|---|---|---|
| 1968 | 57,693 | 6,947 | 21,932 | 86,572 |
| 1969 | 57,545 | 7,657 | 22,650 | 87,852 |
| 1970 | 56,437 | 8,115 | 23,542 | 88,094 |
| 1971 | 51,938 | 8,221 | 24,073 | 84,232 |
| 1972 | 49,022 | 8,803 | 24,632 | 82,457 |
| 1973 | 44,968 | 8,206 | 24,529 | 77,703 |