**Arlene FLAX, Etc., et al.,
Plaintiffs–Appellants,**

v.

**W.S. POTTS, et al.,
Defendants–Appellees.**

No. 88–1188.

United States Court of Appeals,
Fifth Circuit.

Jan. 26, 1989.

Leon Haley, Jr., Fort Worth, Tex., for plaintiffs-appellants.

David Owen, Quillin, Owen & Thompson, Fort Worth, Tex., for Ft. Worth Independent School Dist.

Marie K. McElderry, David K. Flynn, Washington, D.C., for amicus curiae, U.S.

Before WILLIAMS, HIGGINBOTHAM and SMITH, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

In this appeal we must evaluate the circumstances under which a desegregation plan may be altered to eliminate busing in a school district which has not been declared unitary but which has operated an approved desegregation plan effectively for a number of years. Specifically, plaintiffs appeal a district court's decision that modified the Fort Worth Independent School District's (FWISD) Desegregation Plan by terminating the remaining busing of some 1233 elementary students for desegregation purposes. 680 F.Supp. 820. We affirm the district court's decision, finding no abuse of discretion by the district judge in deciding modification was proper.

## I. *Facts and Prior Proceedings*

In 1959, a school desegregation action was filed against the FWISD. In 1962, a federal district court declared the dual system unconstitutional, *Flax v. Potts*, 204 F.Supp. 458, 461 (N.D.Tex.1962), *aff'd*, 313 F.2d 284 (5th Cir.1963). The school district then adopted a "stair-step" plan in 1963 and voluntarily accelerated the plan so that all grades were involved by 1967.

In 1970, the plaintiffs requested further relief. A plan was suggested and was approved by the district court in the same year. Upon appeal we reversed and remanded with directions to implement a "student assignment plan and a faculty assignment plan that complies with the principles established in *Swann v. Charlotte–Mecklenberg Board of Education....*" *Flax v. Potts*, 450 F.2d 1118, 1118–19 (5th Cir.1971). Another plan was then submitted in 1971, but this Court found the plan still fell short of the mandate of *Swann* that "all vestiges of state-imposed segregation be eliminated from the public schools." The court noted that the proposed plan left 12,000 of the district's 21,000 black students in sixteen virtually all-black schools. *Flax v. Potts*, 464 F.2d 865, 866 (5th Cir.), *cert. denied*, 409 U.S. 1007, 93 S.Ct. 433, 34 L.Ed.2d 299 (1972).

On August 23, 1973, the district court approved a plan in accordance with this Court's directives. The plan called for the clustering of the remaining all-black schools with predominately white schools. The plan also included a provision for majority-to-minority transfers and a provision requiring faculty assignments in each school to reflect the ratio of white to black teachers in the school district as a whole. From 1973 to 1983, additional modifications were made to the plan.[1]

In 1983, the parties filed a joint motion amending the desegregation plan that the court approved with minor modifications. *Flax v. Potts*, 567 F.Supp. 859 (N.D.Tex. 1983).[2] The amendments (1983 Amendments) allowed 30 neighborhood elementary schools that had previously been part of the busing program to "stand-alone," based on the natural integration that was occurring in those neighborhoods. It set aside for educational enhancement the $1.5 million saved by the reduction in busing. It also authorized additional magnet schools, strengthened preschool programs, and provided for monitoring provisions.

This appeal involves nineteen of the elementary schools that were clustered or paired by the 1983 Amendments. Eleven schools in historically white neighborhoods were clustered or paired with eight schools in predominantly black neighborhoods. Around 1233 students, all in the second and third grades, were still being bused for desegregation purposes.[3] These students

---

1. During the period, among other things, the use of magnet schools was implemented, the faculty assignment ratio was modified to allow only a ten percent variance, and the Mexican–Americans, the intervenors in this action, were recognized as a separate ethnic minority. Also, in 1975, the action was transferred from Judge Brewster's docket to Judge Mahon's docket where it has remained.

2. The joint motion was prepared by the Citizens Advisory Committee, a multi-ethnic group made up of nine persons named by the School Board and two persons named by the plaintiffs.

3. Under the 1983 Amendments, busing as a whole for desegregation purposes was reduced by seventy-five percent. The court found that reduced busing actually furthered desegregation efforts because of naturally integrated neighbor-

constituted approximately 2% of the student body of the School District. This busing improved the majority-minority ratios at the clustered schools, and no student was bused more than one year.

In July 1987, the court *sua sponte* set a hearing for reviewing this portion of the 1983 Amendments. Following the hearing, the court disbanded the clusters and discontinued the busing of the second and third grade students. The elementary schools returned to a neighborhood system of assignment. The court included in its order a provision requiring that the money saved from the discontinuance of busing be used for enrichment programs at the minority schools. Order dated July 10, 1987, *Flax v. Potts*, Civil Action No. 4205–E, at 4.[4]

The district court reasoned that the usefulness of busing no longer outweighed its costs even though the termination of busing actually would result in an immediate but temporary increase by more than ten percent in the number of students of the predominant race in several of the nineteen schools.[5] Basing its decision on the desegregation plan as a whole, the district court found busing to be only a small part of the overall plan and to have little impact.[6]

The court found busing was losing its effectiveness because of changed demographics in the FWISD. Since 1983, the trend toward greater neighborhood integration had continued, particularly in the eleven historically white neighborhoods.

The court found busing disruptive to these integrated neighborhoods. At the time of the district court's decision, 674 students were being bused away from the 11 substantially integrated neighborhoods into the clusters. Thirteen percent of the students being bused into the predominately black areas were black students and 4% of the students being bused out of the predominantly black schools were white students.

The district court also noted the lower enrollment of students in the FWISD as a whole, particularly white students, while the county in which the school district is located continued to grow.[7] There are 32,000 fewer white students in the FWISD as a whole today than there were in 1968, with the number of black students remaining the same and the number of hispanics increasing by 10,000.[8] More dramatically, there was a 43% loss of enrollment from first to second grade in the elementary schools implementing the busing for desegregation purposes. This loss of enrollment was not limited to white students, suggesting a dissatisfaction by all students with busing.

Underlying the district court's conclusion was its awareness of the difficulty of the busing that was being implemented. The busing involved was cross-town travel. The district court found the longest one-way distance to be around 13.8 miles with

hoods. *Flax v. Potts*, 567 F.Supp. at 864. All the parties agreed.

**4.** The court based its decision on documentary evidence and two witnesses presented by the School District at the hearing. The plaintiffs presented no evidence of their own, choosing instead to rely on the cross-examination of the School District's witnesses to bring out their own arguments.

**5.** The district court found, and it is apparently undisputed, that the termination of the clustering plan for the elementary schools would have the effect of decreasing the integration in these schools, especially in seven of the seventeen formerly *de jure* black schools. Specifically, the district court found that if busing was discontinued the total increase in the predominantly black schools of black students would be 405 students out of a total enrollment of 5,156 students.

**6.** In finding the projected decrease in integration to have only a minimal impact on the system as a whole, the court noted that in the predominantly black schools, less than 10% of the students in those schools were bused-in white students. Out of a total enrollment of 5,271 students in these schools, 501 white students were transported in.

**7.** The district court pointed to a 1980 census that showed a substantial increase in the population of Tarrant County while that of FWISD declined.

**8.** The district court found that in 1970, the FWISD had a total population of 88,094. 56,437 (64%) were white, 23,542 (27%) were black, 8,115 (9%) were hispanic, and 1,806 (3%) were of other races.

at least one student riding the bus more than three hours a day. The shortest distance was found to be around 2.3 miles one way, but even on this trip, the student was on the bus for over an hour per day. The average one-way distance found by the court was 9.3 miles, and the median round trip was found to be over an hour. The annual cost of the busing was $313,462, with a net cost of $175,000 to the FWISD.

## II. Weight to be given the District Court's Determination

■ A motion for modification of a decree is addressed to the discretion of the district court and may be overturned on appeal only for an abuse of that discretion. *Sullivan v. Houston Independent School Dist.*, 475 F.2d 1071, 1078 (5th Cir.), cert. denied, 414 U.S. 1032, 94 S.Ct. 461, 38 L.Ed.2d 323 (1973).

■ The findings by the district court are given considerable deference by this Court since it is the district court that is most familiar with the litigation and the local conditions. *See Brown v. Board of Education*, 349 U.S. 294, 299, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955). The current presiding district judge has overseen the school district's actions since 1975.

Deference by this Court is also particularly appropriate where, as here, the implementation of the desegregation plan has continued for fifteen years without any allegations of intentional segregation on the part of the FWISD. In fact, the School District has been commended many times by the courts for its dedication to the elimination of inequality in its schools. *See Flax v. Potts*, 464 F.2d at 866. The School District has operated a comprehensive desegregation plan for a considerable length of time and is moving close to the declaration of unitary status.[9] Indeed, the School

District is in compliance with all the requirements of the desegregation plan.[10]

## III. The District Court's Determination: Not an Abuse of Discretion

### A. Applicable Law for Modification of the Plan

Because the termination of this limited busing, at least in the short term, will have the effect of decreasing integration, the pre-unitary FWISD was under a "heavy burden" to justify this change in the court ordered plan. It had to show its actions "serve[d] important and legitimate ends" that outweighed the resegregative effects of the change. *Dayton Board of Education v. Brinkman*, 443 U.S. 526, 538, 99 S.Ct. 2971, 2979, 61 L.Ed.2d 720 (1979) (citing *Wright v. Council of Emporia*, 407 U.S. 451, 467, 92 S.Ct. 2196, 2206, 33 L.Ed. 2d 51 (1972)). The court was under a duty to "scrutinize" the action to ensure that the modification was not the result of present or past discriminatory action. *Swann v. Charlotte–Mecklenberg*, 402 U.S. 1, 25–26, 91 S.Ct. 1267, 1281, 28 L.Ed.2d 554 (1971).

The mere fact that the action decreased racial integration, of course, does not outlaw it. There is no constitutional mandate that each school in the school district reflect the racial composition of the school district as a whole. *Id.* at 24, 91 S.Ct. at 1280. As this Court has recently reiterated, a " 'school board's constitutional duty is to cure the continuing effects of the dual school system, not to achieve an ideal racial balance.' " *Monteilh v. St. Landry Parish School Board*, 848 F.2d 625, 632 (5th Cir.1988) (quoting *Lee v. Tuscaloosa City School System*, 576 F.2d 39, 41 (5th Cir.1978)). Busing is but one remedial measure set out in *Swann*. It is not mandatory, but permissive. *Id.*

---

9. How close the school is to unitary status is a legitimate consideration in deciding whether a modification should be allowed. The necessity for strong, unyielding steps is greatest at the outset, and once the vestiges of segregation have been largely eliminated, school districts should be given more deference to pursue legitimate educational goals. *Wright v. Council of Empo-*

*ria*, 407 U.S. 451 at 470, 92 S.Ct. 2196 at 2207, 33 L.Ed.2d 51 (1973).

10. Other requirements still applicable include faculty and staff assignments; school construction; and desegregation of transportation, athletics, and extra-curricular activities.

## B. *Application of the Law*

■ The district court did not abuse its discretion in determining that the FWISD met its burden of proving that any effect that the termination of busing might have upon the racial complexion of its schools would be "genuinely nondiscriminatory." *Swann,* 402 U.S. at 26, 91 S.Ct. at 1281. The court found that: "any racial imbalance in these schools is not the result of past segregation practices but of changes in residential patterns." The district court correctly determined that any incremental "resegregative" effect caused by the cessation of busing was outweighed by: (1) recognizing and preserving the residential integration accomplished thus far, (2) permitting a greater degree of local control to a school district which has established a commitment to desegregation, (3) increasing the quality of the overall educational program in the district, and (4) stabilizing the overall racial composition of the district.

First, by terminating busing, the district court recognized the integration which was already occurring in the neighborhood residential patterns. The district court found that to continue non-neighborhood assignments here would cause many children to attend more segregated schools. The court was aware that continued busing would transport black students out of integrated areas into predominantly black schools, and white students out of predominantly black schools into schools where their race is in the majority. The Supreme Court has recognized that school segregation may influence "the patterns of residential development of a metropolitan area and have important impact on [the] composition of inner-city neighborhoods." *Id.* at 20–21, 91 S.Ct. at 1278. Because of this interrelationship between school segregation and residential patterns, it is important to recognize the residential integration that has been achieved by allowing local neighborhood schools.

Second, the district court stressed the importance of local control to the quality of education. *See Milliken v. Bradley,* 418 U.S. 717, 741–42, 94 S.Ct. 3112, 3126, 41 L.Ed.2d 1069 (1974) (*Milliken I*); *Spangler v. Pasadena City Board of Educ.,* 611 F.2d 1239, 1245 n. 5 (9th Cir.1979) (emphasizing the "necessary concern for the important values of local control of public school systems"). The contributions which neighborhood schools can make to the quality of education are obvious. For example, where there is less time spent on transportation to and from school, more time is allowed for extra-curricular activities and parental involvement. Also, the money saved from the termination of busing will be spent on the primarily minority schools.

Third, the quality of education is a legitimate concern. As the Supreme Court stated, the function of the federal courts is " 'to desegregate an *educational* system in which the races have been kept apart, without, at the same time, losing sight of the central educational function of the schools.' " *Milliken v. Bradley,* 433 U.S. 267, 280 n. 15, 97 S.Ct. 2749, 2757 n. 15, 53 L.Ed.2d 745, (*Milliken II*) (quoting *Milliken I,* 418 U.S. at 767, 94 S.Ct. at 3137) (White, J., dissenting) (emphasis in original).

Finally, the evidence suggested that fewer students would leave the FWISD if busing is terminated, particularly white students, with the effect that the racial composition of the district as a whole would stabilize, creating more residential integration. *See Stout v. Jefferson County Board of Education,* 537 F.2d 800, 802–03 (5th Cir. 1976); *Riddick v. School Board of Norfolk,* 784 F.2d 521, 539–40 (4th Cir.), *cert. denied,* 479 U.S. 938, 107 S.Ct. 420, 93 L.Ed.2d 370 (1986).[11] The white population in the FWISD began to stabilize after the 1983 Amendments were implemented, evi-

---

11. While "white flight" cannot be used as a justification for avoiding the affirmative duty to desegregate, *United States v. Scotland Neck Board of Education,* 407 U.S. 484, 491, 92 S.Ct. 2214, 2218, 33 L.Ed.2d 75 (1972), a school district—especially one nearing a declaration of unitary status—has a legitimate interest in retaining a sufficient number of white students to provide an integrated educational experience for the students. Thus, this finding is a relevant concern. *See Stout,* 537 F.2d at 802–03.

dencing a satisfaction with the naturally integrated neighborhood schools created at that time. Thus, the district court found the long term effect of the current modification more likely to increase integration than continuing this limited amount of cluster busing. *See Pitts v. Freeman,* 755 F.2d 1423, 1427 (11th Cir.1985) (noting that the long term effect is a relevant consideration).

### IV. *Conclusion*

The termination of busing was only a small part of the desegregation plan which will still be in effect. When weighed against the established effectiveness of the rest of the plan and the benefits that would result by the abandonment of busing, the busing of less than 2% of the students in the FWISD was properly found to contribute little to the overall plan and might in fact impair it. More viable desegregation techniques—gerrymandered boundaries, magnet schools, majority-to-minority transfer policies, and integrated faculties and staff—have been continuingly successful. Thus, we hold that the district court did not abuse its discretion in ordering that the limited busing for desegregative purposes be discontinued.

AFFIRMED.