Arlene FLAX, Etc., et al.,
Plaintiffs–Appellants,

v.

W.S. POTTS, et al., Defendants,

Fort Worth Independent School District, a Corporation,
Defendant–Appellee.

No. 89–7006.

United States Court of Appeals,
Fifth Circuit.

Oct. 24, 1990.

Leon Haley, Jr., Ft. Worth, Tex., for plaintiffs-appellants.

David B. Owen, Quillin, Owen & Thompson, Ft. Worth, Tex., for defendant-appellee.

Before REAVLEY, DUHÉ, and WIENER, Circuit Judges.

WIENER, Circuit Judge:

In this school desegregation case, the Fort Worth Branch of the National Association for the Advancement of Colored People (NAACP) appeals the district court's order declaring the Fort Worth Independent School District (FWISD) "unitary in every respect, except for the existence of a homogeneous student population." (*Flax v. Potts*, 725 F.Supp. 322, 330 (N.D.Tex. 1989) Such a population is not constitutionally required, the court explained,

"when the school district has made intensive efforts to eliminate one-race schools and further measures would be both impractical and detrimental to education." *Id.* Based on its findings of fact and conclusions of law, the district court declared that the FWISD had no policy or practice of discrimination in student, faculty, or staff assignments; in transportation; in extra-curricular activities; or in school facilities. Stating that the declaration of unitary status required the federal court soon to cease supervising the FWISD, the court, nevertheless, retained jurisdiction for a further three years as this court mandated in *Youngblood v. Board of Pub. Instruction,* 448 F.2d 770 (5th Cir.1971). The district court also assured the plaintiffs that it would not dismiss the case without providing them both notice and an opportunity to show cause why the court should further delay dismissing the case. Finding no reversible error, we affirm.

## I

Because our most recent opinion in this litigation comprehensively related the facts and proceedings in the thirty years from filing to termination of busing, we see no need to repeat that narrative.[1] To bring it up to date, however, we provide the facts and proceedings bearing only on this latest dispute.[2]

In 1988 when it resolved the busing issue, the district court indicated that it intended to reexamine the entire desegregation plan. *See Flax v. Potts,* 680 F.Supp. 820 (N.D.Tex.1988), *aff'd,* 864 F.2d 1157 (5th Cir.1989). To that end, the court *sua sponte* entered an order on March 2, 1988, designating a period for filing motions for any modification, revision, or amendment to the School District's plan. Order dated Mar. 2, 1988, *Flax v. Potts,* Civil Action No. 4205–E. On July 26, 1988, the court granted the parties' requests for changes in the use and allocation of quality funds and for adjustments in school boundary lines and attendance zones. Order dated July 26, 1988, *Flax v. Potts,* Civil Action No. 4205–E. While denying the proposed modifications regarding black-to-white faculty ratios, the court modified the plan to allow a 20%, rather than a 10%, variance in the faculty ratio requirements in any one school. *Id.*

In its July 26, 1988, order, the district court also scheduled a hearing on both the FWISD motion for a declaration of unitary status and the plaintiffs' and intervenors' motions for additional modifications to the desegregation plan. On April 12–13 and 17–20, 1989, the court held an evidentiary hearing on the motion to declare the FWISD unitary.[3] Its Memorandum Opinion and Order, entered on Sept. 27, 1989, declared "that the former dual school system has been dismantled and that the vestiges of de jure segregation have been removed 'root and branch.'" *Flax v. Potts,* 725 F.Supp. 322, 323. The plaintiffs timely filed notice of appeal on October 25, 1989.

## II

Unitariness is a finding of fact which we review under the clearly erroneous standard. *Ross v. Houston Indep. School Dist.,* 699 F.2d 218, 225–26 (5th Cir. 1983) (citing *Pullman–Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66

---

1. *Flax v. Potts,* 864 F.2d 1157 (5th Cir.1989); for a chronological history *see also Flax v. Potts,* 204 F.Supp. 458 (N.D.Tex.1962), *aff'd,* 313 F.2d 284 (5th Cir.1963); *Flax v. Potts,* 333 F.Supp. 711 (N.D.Tex.1970), *vacated,* 450 F.2d 1118 (5th Cir. 1971); *Flax v. Potts,* 464 F.2d 865 (5th Cir.) *cert denied,* 409 U.S. 1007, 93 S.Ct. 433, 34 L.Ed.2d 299 (1972); *Flax v. Potts,* 567 F.Supp. 859 (N.D. Tex.1983); *Flax v. Potts,* 680 F.Supp. 820 (N.D. Tex.1988), aff'd 864 F.2d 1157 (5th Cir.1989); 725 F.Supp. 322 (N.D.Tex.1989).

2. Order dated March 2, 1988, *Flax v. Potts,* Civil Action No. 4205–E (inviting parties to submit desired modifications as proposed amendments

to desegregation plan); Memorandum Opinion and Order dated July 26, 1988, *Flax v. Potts,* Civil Action No. 4205–E (concerning quality funds, boundary lines, attendance zones, black-to-white faculty ratios, variance in faculty ratio requirements, evidentiary hearing on unitary status and modifications to desegregation plan); Memorandum Opinion and Order dated Sept. 27, 1989, *Flax v. Potts,* 725 F.Supp. 322 (N.D.Tex. 1989) (declaring FWISD unitary and retaining jurisdiction for three years).

3. The Mexican–American intervenors did not oppose a declaration of unitary status. 725 F.Supp. 322, 323.

(1982)). Factual findings in school desegregation cases are entitled to great deference on review, especially when, as in this case, the presiding judge has supervised the case for many years. *See Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 457 n. 6, 99 S.Ct. 2941, 2946 n. 6, 61 L.Ed.2d 666 (1979). Furthermore, this court stressed in an earlier opinion in this case that deference is also "particularly appropriate where, as here, the implementation of the desegregation plan has continued for fifteen years without any allegations of intentional segregation on the part of the FWISD. In fact, the School District has been commended many times by the courts for its dedication to the elimination of inequality in its schools." *Flax*, 864 F.2d at 1160.

■ In a unitary school district, "schools are not identifiable by race[,] and students and faculty are assigned in a manner that eliminates the vestiges of past segregation." *Monteilh v. St. Landry Parish School Bd.*, 848 F.2d 625, 629 (5th Cir.1988) (quoting *United States v. Lawrence County School Dist.*, 799 F.2d 1031, 1034 (5th Cir.1986)). A district court in this circuit does not dismiss a school desegregation case until at least three years after it has declared the system unitary. *Youngblood v. Board of Pub. Instruction*, 448 F.2d 770, 771 (5th Cir.1971).

On appeal the NAACP claims that the "totality of deficiencies" within the FWISD indicates that the system is not yet a unitary one. The NAACP challenges the district court's findings on student, faculty, and staff assignments. It also argues that the FWISD's practice of building too many new schools in black neighborhoods, when the District knows that these schools will be more than 98% one-race schools, causes racial imbalance.

### *Totality of Deficiencies*

■ Before we turn to those individual aspects of the unitariness question which the NAACP raises, we address the NAACP's charge that the "totality of deficiencies" in the desegregation plan precludes a finding of unitary status. The NAACP's contention resembles that which

this circuit and the tenth and first circuits have explicitly rejected—that a school system cannot achieve unitary status incrementally. *United States v. Overton*, 834 F.2d 1171 (5th Cir.1987); *Ross v. Houston Indep. School Dist.*, 699 F.2d 218 (5th Cir. 1983); *Keyes v. School Dist. No. 1*, 895 F.2d 659 (10th Cir.1990), *petition for cert. filed*, 58 U.S.L.W. 3725 (U.S. Apr. 30, 1990) (No. 89–1698); *Morgan v. Nucci*, 831 F.2d 313 (1st Cir.1987); *contra Pitts v. Freeman*, 887 F.2d 1438, 1446–47 (11th Cir. 1989) (rejecting the First Circuit's ruling that school systems may achieve unitary status incrementally), *petition for cert. filed*, 58 U.S.L.W. 3531 (U.S. Feb. 12, 1990) (No. 89–1290).

■ This circuit has addressed the issue of achieving unitary status incrementally on at least two occasions. In *Overton*, 834 F.2d 1171, 1177 (1987), we agreed with the First Circuit's conclusion in *Morgan*, 831 F.2d 313 (1987), that a school system can achieve unitary status incrementally and that, when it does so, the court will abdicate its supervisory role as to the aspect of the desegregation plan proclaimed unitary. Similarly, we had earlier held in *Ross*, 699 F.2d at 228, that—given "the undisputed fact that [the Houston Independent School District] is unitary in every aspect but the existence of a homogeneous student population"—the district court had not erroneously declared the District unitary. Implicit in our earlier decisions lies the assumption that both particular aspects of the desegregation plan and the overall plan itself may be unitary even when particular aspects contain deficiencies that are not serious or when further measures to render an aspect unitary are not practicable and would be detrimental to education.

Decisions in the tenth and first circuits reinforce our conclusion. Earlier this year the Tenth Circuit also held that achieving unitary status incrementally is possible. *Keyes*, 895 F.2d at 666 (1990). The court in *Keyes* ruled that a district court can declare a school district "unitary in certain aspects, even though other aspects remain nonunitary." *Id.* The *Keyes* court reasoned that because a remedy must be tai-

lored to fit the scope of the violation, *id.* (citing *Milliken v. Bradley,* 433 U.S. 267, 280-81, 282, 97 S.Ct. 2749, 2757-58, 2758, 53 L.Ed.2d 745 (1977); *Dayton Bd. of Educ. v. Brinkman,* 433 U.S. 406, 420, 97 S.Ct. 2766, 2775, 53 L.Ed.2d 851 (1977)), the court must relinquish supervisory control over a particular school district policy once the need to supervise that policy closely ceases. *Id.*

The First Circuit stated that the Supreme Court's decision in *Pasadena City Bd. of Educ. v. Spangler,* 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976), required it to reject the contention that a failure to achieve unitariness in other areas justified the district court's continuing to impose a plan in an area in which a school board had achieved unitariness. *Morgan,* 831 F.2d at 318; *contra Pitts,* 887 F.2d at 1447 (in *Spangler* Court "simply refused to approve" the Board's rigid student assignment requirement and did not support incremental approach). The Court in *Spangler* stated that in attaining unitary status in student assignments, though not in other facets of the Board's operations, the district court had "fully performed its function of providing the appropriate remedy for previous racially discriminatory attendance patterns." *Spangler,* 427 U.S. at 437, 96 S.Ct. at 2705.

*Spangler* addressed "the extent of a district court's authority in imposing a plan designed to achieve a unitary school system." *Id.* at 429, 96 S.Ct. at 2701. More specifically, the Supreme Court disagreed with a divided panel of the Ninth Circuit which had ruled "that the district court had not abused its discretion in refusing to grant *so much of the petitioner's motion for modification as pertained to* [the assignment-of-students] aspect of the order." *Id.* at 431–32, 96 S.Ct. at 2702–03 (emphasis added). The Court explicitly acknowledged that although disputes might still exist concerning the Board's compliance with other aspects of the plan, such as hiring and promoting teachers, that portion of the plan designed to obtain racial neutrality in student attendance had achieved its objective. *Id.* at 436, 96 S.Ct. at 2704. Accordingly, the Board was entitled to relief from the district court's order on that aspect alone. *Id.* at 440, 96 S.Ct. at 2706.

■ We agree with the Tenth Circuit's reasoning in *Keyes,* 895 F.2d at 666, that remedies must be narrowly structured to address the scope of a violation and that, consequently, once the need for close supervision of a particular facet of a school desegregation plan ceases, a court must not continue to supervise that particular facet. To continue supervision once the wrong is righted, as we noted in another school desegregation case, "effectively changes the constitutional measure of the wrong itself: it transposes the dictates of the remedy for the dictates of the constitution." *Overton,* 834 F.2d at 1176. Additionally, because retained supervision restricts state government, the principles of federalism require that federal courts draw the limits which they "impose on the state no more tightly than the limits of the Constitution." *Id.* at 1177.

■ On the basis of the foregoing principles, we reject the plaintiffs' contention that the totality of deficiencies prevents the FWISD's achieving unitary status and requires the court to suspend implementing the *Youngblood* probationary period. If, as in this case, a "deficiency" is not so serious as to render nonunitary a particular aspect of a district's policies, such as student assignments, then the sum of such non-serious deficiencies, no one or more of which renders a particular aspect nonunitary, will usually not render the overall desegregation plan nonunitary. Nevertheless, we do recognize the possibility that the cumulative effect of all deficiencies, of which no one alone or no combination of less than all renders an aspect nonunitary, may render the overall plan nonunitary. Such is not the situation in this case.

### Student Assignments

■ The FWISD is the third largest school district in Texas and among the fifty largest school districts in the country. *Flax,* 680 F.Supp. at 826 (N.D.Tex.1988). In 1970, the FWISD had a student population of 88,094, of whom 56,437 (64%) were

white; 23,542 (27%), black; and 8,115 (9%), Hispanic. *Id.* The school district operated 117 schools in 1970, of which 78 were elementary schools, 20 were middle or junior high schools, and 15 were high schools. *Flax,* 464 F.2d at 867 (1972).

For the school year 1988–89, the record reveals that the student population was 68,422, of whom 24,343 (35.6%) were white; 24,317 (35.6%), black; 18,003 (26.3%), Hispanic; and 1,655 (2.4%), Asian. In 1988 the FWISD had 105 schools, *Flax,* 680 F.Supp. at 826, and the record indicates that this number included 64 elementary schools, 20 middle schools, and 12 high schools.[4]

Although its brief is unclear on this point, the NAACP charges that seven schools are direct vestiges of the dual system because they have token white students.[5] The NAACP also states that while the FWISD has 12 high schools, 68% of all black students attend 4 high schools in black neighborhoods. It claims that majority-to-minority transfers do not work because parents prefer to send their children to the "new school,"[6] and that sending black students from predominantly white Southwest High School to predominantly black O.D. Wyatt High School also perpetuates the dual system. The NAACP also claims that the magnet programs do not work because only 2,500 out of 66,000 students attend them;[7] that in these programs, which are located in predominantly black schools, white magnet school students are isolated from the general student population; and that magnet students also have a separate graduating class within the

school. Finally, the NAACP posits that the FWISD has taken steps "indirectly to affirmatively insure" that schools become more segregated "by allowing too many new schools to be build [sic] in the black communities, all the time knowing these schools will continue to be more than ninety-eight percent 'one' race schools."

The Supreme Court has stated that "the constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole." *Swann v. Charlotte–Mecklenburg Bd. of Educ.,* 402 U.S. 1, 24, 91 S.Ct. 1267, 1280, 28 L.Ed.2d 554 (1971); *see also Ross,* 699 F.2d at 227–28 ("Constructing a unitary school system does not require a racial balance in all of the schools."). Instead, as we stated in our decision in this case last year, "[t]he school board's constitutional duty is to cure the continuing effects of the dual school system, not to achieve an ideal racial balance." *Flax,* 864 F.2d at 1160 (citing *Monteilh v. St. Landry Parish School Bd.,* 848 F.2d 625, 632 (5th Cir.1988) (quoting *Lee v. Tuscaloosa City School Sys.,* 576 F.2d 39, 41 (5th Cir. 1978))). The "existence of a few racially homogeneous schools within a school system is not per se offensive to the Constitution." *Monteilh,* 848 F.2d at 633 (quoting *Valley v. Rapides Parish School Bd.,* 702 F.2d 1221, 1226 (5th Cir.), *cert. denied,* 464 U.S. 914, 104 S.Ct. 276, 78 L.Ed.2d 256 (1983)).

The district court found that in 14 of the 98 schools in the district the student popu-

---

**4.** At the unitary status hearing on April 12, 1989, "the assistant superintendent for elementary and second grade" education in the FWISD, Dr. E.D. Powell, testified that the system had 102 operating schools.

**5.** The NAACP's brief is unclear as to the precise number of schools involved. It states—

These schools are James E. Guinn and East Van Zandt, combined into a new school further in the black community, now named Van–Zandt–Guinn. Riverside Elementary renamed Versis Williams school has the same address that it had in 1953–1954 under the "dual system". Dunbar Elementary renamed Logan Elementary, Dunbar Elementary–Jun-

ior on Willie Street is now Dunbar Fifth–Sixth Center, Dunbar Middle school, Dunbar High School, new schools build [sic] and Como all existed back in 1953–54 under the "Negro schools".

(record references omitted). The record suggests that the phrase "new schools buil[t]" refers to new Dunbar Middle and High Schools.

**6.** Once again the brief is unclear. It does not specify which "parents" or which "new school."

**7.** Thirteen schools have magnet programs—4 in elementary schools; 5 in middle schools; 4 in high schools; and none in white plurality schools.

lations are more than 80% black. The NAACP targets 7 schools which it claims have only token white students. We must, therefore, address whether a student population of 80% renders those schools one-race schools[8] and, if so, whether 14 out of 98 schools constitutes an impermissibly large number of one-race schools.

■ In determining whether school officials and courts have attacked the lingering effects of discrimination with all the weapons which their authority entitles them to employ, we recognize that not only is each district unique, but also that conditions in each district largely determine the remedies necessary to eradicate discrimination. *See Ross*, 699 F.2d at 227.

To eliminate the vestiges of past discrimination in student assignments, the district court in this case has required the FWISD to institute a full panoply of remedial measures which comply with the principles that the Supreme Court prescribed in *Swann*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). The school district initiated massive, cross-town busing; paired certain elementary schools for cluster busing; closed some schools; and instituted a "pyramid feeder system" to "feed" students from elementary schools into designated middle schools, and from middle schools into designated high schools. The district also adopted a majority-to-minority transfer policy, redrew attendance zones, and implemented multi-age grouping when busing or other remedial tools could not alter circumstantial incidents of racial isolation.

Drawing on its lengthy experience with the circumstances of this case, the district court concluded that these exhaustive measures have succeeded in removing the vestiges of the dual system. It characterized as "essentially uncontroverted" the evidence offered at the unitary status hearing that the FWISD had eliminated all vestiges

of discrimination. *Flax*, 725 F.Supp. at 330. The district court particularly found magnet schools an "indispensable tool in integrating the FWISD." Id. at 325. They are, the court found, "a very successful means of meeting the school district's goals of quality education and integrated schools." Id. It also found the majority-to-minority transfer programs "effective." Id. The court declared that "any racial imbalance in the schools of FWISD [is] not the result of past or present segregative practices but of changes in residential housing patterns." Id. at 328. In these circumstances, the court found that, "absent desegregation busing ... no additional remedial tools could be utilized to adjust the racial make-up of student assignments." Id. at 325. Indeed, the court also suggested that in Fort Worth's changing demographic situation even busing would have limited effect. Id. at 328. The changing housing patterns of the recent past had rendered the limited desegregation busing under the 1983 plan "an unreasonable attempt to achieve a complete homogenization of all student bodies." *See Flax*, 680 F.Supp. at 831.

During the quarter-century in which the FWISD has been implementing various desegregation plans, residential living patterns in Fort Worth and in Tarrant County have changed dramatically. The record shows that the population of Fort Worth decreased by 2½% between 1970 and 1980, that the population was 393,455 in 1970 and 383,000 in 1980; and that the population of Tarrant County increased by about 20% during the same period. The record also reflects that during the same period white enrollment in the FWISD dropped dramatically; that more than 33,000 fewer white students were enrolled in the district in 1984 than in 1968.

■ The changes in housing patterns are not the result of the District's efforts to foster segregation. Because those changes occurred during the life of

---

8. Courts have accepted that, depending on circumstances, different percentages may define a school as a one-race school. *See Davis v. East Baton Rouge Parish School Bd.*, 721 F.2d 1425, 1431 (5th Cir.1983) (noting expert's use of 90%); *Singleton v. Jackson Mun. Separate School Dist.*, 541 F.Supp. 904, 910 (S.D.Miss.1981) (90%);

*Riddick v. School Bd.*, 784 F.2d 521, 533 n. 13 (4th Cir.) (less than 30% or more than 70%), *cert denied*, 479 U.S. 938, 107 S.Ct. 420, 93 L.Ed.2d 370 (1986). Counsel for the NAACP stated during oral argument that the parties had agreed to 80% as the percentage which would render a FWISD school a one-race school.

the desegregation plan, they are reactions to that plan—to the extent that they are not reactions to other social and economic factors. *See Ross*, 699 F.2d at 226.[9] The FWISD is not now required to take further steps to counter the effects of what may amount to a "white slight" to its plan. We repeat here what we declared when similar circumstances arose in the Houston Independent School District: "school officials who have taken effective action have no affirmative fourteenth-amendment duty to respond to the private actions of those who vote with their feet." *Ross*, 699 F.2d at 225 (citing *Spangler*, 427 U.S. 424, 434–36, 96 S.Ct. 2697, 2703–05, 49 L.Ed.2d 599 (1976)).[10]

Moreover, recent indications that residential patterns in Fort Worth are stabilizing encourages this court as they did the district court. The district court found that natural integration is occurring in once all-white residential neighborhoods. Consequently, minority enrollment in schools in eleven neighborhoods where cluster busing once occurred is now increasing. Furthermore, the record confirms that between October 1987 and October 1988, enrollment increased by one thousand students, and that enrollments for 1988–89 showed that students returning to the public schools from private schools were doing so in ethnic proportions comparable to those in previous enrollment.

The district court's omitting from its orders any requirements to diminish the racial identifiability of the schools in which the black student population exceeded 80% suggests that these schools were complying with the court's desegregation orders. The absence of such requirements also reinforces the court's conclusion that any segregation then existing resulted from residential housing patterns and not from the former dual school system. Finally, as the district court observed, this court in *Ross* did not reverse a finding of unitariness when 55 out of 226 schools in Houston had a black student population which exceeded 90%. Even if the FWISD could devise a plan that would spread white students equally among all the schools, 61.9% of the students in each school would still be black and Hispanic. *Cf. Ross*, 699 F.2d at 226 (even if white students spread evenly among all schools, 74% of students in each school would be black and Hispanic).

In the face of the foregoing observations, we cannot say that the district court was clearly erroneous in concluding that the one-race schools remaining in Fort Worth were the product of dramatic shifts

9. Because we hold that the district court did not err in declaring that the FWISD had eradicated all vestiges of the dual system and that further measures to eliminate the remaining one-race schools would be impractical, we note that the district court did not prematurely conclude that residential patterns could constitute legal cause for racial imbalance in the schools. *See Lee v. Macon County Bd. of Educ.*, 616 F.2d 805, 810 (5th Cir.1980) (citing *Flax v. Potts*, 464 F.2d 865 (5th Cir.), *cert. denied*, 409 U.S. 1007, 93 S.Ct. 433, 34 L.Ed.2d 299 (1972)).

10. The NAACP states that this case is similar to the *Yonkers* case. Though its brief never fully cites the *Yonkers* case, we presume that the NAACP means *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181 (2d Cir.1987). The NAACP also fails to state why this decision should be relevant. We presume that it believes that the analysis of housing patterns in *Yonkers* is somehow relevant to an analysis of housing patterns in Fort Worth. If such is the NAACP's contention, we reject it because the facts in *Yonkers* differ drastically from those in this case.

Two critical facts in particular distinguish the cases. First, the Yonkers city council "had fis-cal control of the Board's operations." *Yonkers*, 837 F.2d at 1231. Second, the Mayor of Yonkers appointed the members of the school board. *Id.* at 1210. Consequently, the Mayor and city council could compel the board to collude in reinforcing segregation in the schools.

For twenty years the Yonkers city council's decisions had confined low-income housing to areas which minorities already heavily populated. *Id.* at 1233. When the school board superimposed its neighborhood-school policy upon the City's segregated housing policy, racially identifiable schools resulted and segregation in the schools increased. *Id.* at 1233.

In this case, the record does not contain any allegations of collusion between the city council and FWISD. Nothing on the record indicates that the city council in Fort Worth controls the school district's budget, with the authority to approve it line by line as the Yonkers city council had. The mayor does not appoint the Trustees of the FWISD; they are elected. The record also does not contain any history of segregative housing policies on the part of the city council.

in housing patterns and not, more perniciously, of the former dual school system.

### New School Construction

■ On the constructing of new schools, the NAACP merely charges that the FWISD is constructing too many in black neighborhoods when it knows that these schools will continue to be more than 98% one-race schools. This charge is without merit. During this prolonged litigation, the district court has on several occasions considered how new school construction would affect desegregation. *See, e.g., Flax*, 450 F.2d at 1119. In its order of April 3, 1987, the most recent occasion on which it considered the construction of specific schools, the district court, in granting the *unopposed* motion to approve the Facilities Improvement Program, found that the proposed facilities fully complied with the FWISD's duty to maintain a school system free of racial discrimination or segregation.

In its order of September 27, 1989, the district court again found that "[a]ll discrimination in ... school facilities was eliminated with the implementation of the so-called 'stair-step' plan in 1967. No credible evidence was produced at the April 12, 1989[,] hearing which would suggest that any vestige of discrimination currently exists in these areas." *Flax*, 725 F.Supp. at 327. Nothing in either the record or in the NAACP's brief leads us to believe that the district court erred or that the situation concerning school construction has changed since the district court reached its decision.

### Faculty and Staff Assignments

■ The district court concluded that "[a]ll phases of hiring and assigning faculty and staff are free of discrimination on the basis of race in the FWISD." Id. at 329. It added that the record is "uncontroverted that since 1971 the FWISD has maintained faculty and staff assignments at each school which reflect the racial composition of teachers and principals districtwide." Id. The court rejected the NAACP's testimony about a racial imbalance in assignments at some schools because that testimony "appeared to be based on erroneous information." Id. at 330. Finally, the court found that the racial composition of key supervisory positions in the FWISD indicated that the administrative hierarchy is "well-integrated." Id. at 326.

The FWISD acknowledges that six schools in the district do not comply with the required ratio of black-to-white faculty members. It argues, however, that a change in the race of only one or two teachers would restore the ratio. While noting that the FWISD has not achieved the "arduous employment goals" which it set itself, the district court also acknowledged that "fierce competition" for a diminishing pool of minority-race teachers made achieving that goal difficult. Id.

Given the facts which the district court found and our own examination of the evidence on the record, we see no reason to disturb the court's finding that the FWISD has eliminated all discrimination in hiring and assigning faculty and staff. We do note, however, that before the district court dismisses the case at the end of the three-year *Youngblood* period, that court will again have an opportunity to consider whether the FWISD has tried to do all that it could to rectify any imbalance in teacher ratios.

Finally, the district court has also promised the appellants that it will carefully monitor black student performance on achievement tests during the *Youngblood* period and certainly before it dismisses the case. Id. at 330.

### Conclusion

Considering the district court's finding that the FWISD was unitary in every aspect but the existence of a homogeneous student population; that the FWISD had made intensive efforts to eliminate one-race schools; and that further measures would be both impractical and detrimental to education, we conclude that the district court did not err in declaring that the FWISD had eradicated all the vestiges of the former dual school system and had replaced it with a unitary one.

For all the foregoing reasons, we AFFIRM and REMAND to the district court

for further proceedings in accordance with this opinion.