BALDOCK, Circuit Judge, dissenting.
Nothing so needs reforming as other people’s habits.
—Pudd’nhead Wilson’s Calendar Mark Twain, Pudd’nhead Wilson ch. XV.
The Supreme Court vacated this court’s judgment in Brown v. Board of Educ., 892 F.2d 851 (10th Cir.1989), and remanded for reconsideration .in light of its two most recent pronouncements in the field of public school desegregation, Board of Educ. v. Dowell, 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991), and Freeman v. Pitts, — U.S. —, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992). See Board of Educ. v. Brown, — U.S. —, 112 S.Ct. 1657, 118 L.Ed.2d 381 (1992). The vacation of the judgment and remand were apt because both Supreme Court cases address “the duties of a district court during the final phases of a desegregation case____” See Freeman, — U.S. at —, 112 S.Ct. at 1446.
Parsing those decisions for the minimal support they provide its prior resolution, this court again reverses the district court’s judgment and reinstates its prior opinion “in full.” Court’s Opinion at 588, 593. This court again finds the Topeka system not unitary and requires another desegregation plan, at least in the areas of student and faculty/staff assignment, notwithstanding that the Supreme Court has announced important new principles concerning the later phases of school desegregation.
Dowell and Freeman reaffirmed that federal court involvement in school desegregation was always meant to be temporary, confined to remedying a constitutional violation and restoring control to state *594 and local authorities. Freeman, — U.S. —, 112 S.Ct. at 1445; Dowell, 498 U.S. at —, 111 S.Ct. at 636; Lee v. Talladega County Bd. of Educ., 963 F.2d 1426, 1430 (11th Cir.1992). Thus, a federal court may withdraw from supervision of a school district in increments as the district achieves unitary status over each facet of its operations. Freeman, — U.S. at —, 112 S.Ct. at 1445. Once a school district has achieved unitary status, actions concerning student assignment, even if they result in racial imbalance, must be evaluated under traditional equal protection principles which require a showing of intentional discrimination. Dowell, 498 U.S. at —, 111 S.Ct. at 638; United States v. Overton, 834 F.2d 1171, 1175-76 (5th Cir.1987). See also Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 22-23, 91 S.Ct. 1267, 1279-1280, 28 L.Ed.2d 554 (1971) (discussing the use of school desegregation cases for purposes beyond their scope). To read this court’s latest opinion, one would be hard pressed to divine that the school officials prevailed in both Dowell and Freeman, and the Supreme Court reversed the lower appellate courts as going too far.
This court remains convinced that the district court incorrectly (1) required the plaintiffs to prove discriminatory intent, (2) did not accord the plaintiffs the presumption that racially imbalanced schools are attributable to the de jure system, and (3) did not insist on a sufficient showing by the defendant school district to prove compliance with its affirmative duty. Court’s Opinion at 589-91. For several reasons explained previously, I disagree that the district court incorrectly applied the presumption and burden shifting principles involved in a school desegregation case.[1] See Brown, 892 F.2d at 889 (Baldock, J., dissenting). The district court recognized that Topeka had an affirmative duty to eliminate the vestiges of segregation and apparently concluded that the school board had overcome the presumption against it inherent in racially imbalanced schools. See Brown v. Board of Educ., 671 F.Supp. 1290, 1292-93, 1295 (D.Kan.1987). See also Lee v. Etowah County Bd. of Educ., 963 F.2d 1416 (11th Cir.1992). As conceded at oral argument, however, the district court’s short discussion of the burden of proof is not free from ambiguity. See Brown, 671 F.Supp. at 1295.
This case should be remanded to the district court for complete reconsideration. We could then be assured of the district court’s application of the correct presumption and burden shifting principles and have the advantage of the district court making the myriad of required factual findings. More importantly, the district court can incorporate into its analysis the Supreme Court’s recent guidance concerning the role of good faith and demographic change in the later phases of school desegregation.
Given the sharply differing views of the experts in this case, this court should reconsider its insistence on trying the case on appeal. In both Dowell and Freeman, the Supreme Court acknowledged the importance of a district court’s evaluation of the evidence, including expert testimony,[2] in *595 deciding whether a school district has complied with the Constitution. See Dowell, 498 U.S. at —, 111 S.Ct. at 638 (remanding to the district court to decide “whether the Board made a sufficient showing of constitutional compliance”); Freeman, — U.S. at —, 112 S.Ct. at 1440 (concerning whether DCSS had met its affirmative duty, “[p]etitioners and respondents presented conflicting expert testimony about the potential effects that desegregative techniques not deployed might have had upon the racial mix of the schools. The District Court found that the petitioner’s experts were more reliable____”); id. — U.S. at —, 112 S.Ct. at 1439 (in deciding that DeKalb County School System [“DCSS”] was unitary as to student assignment in 1969 despite the presence of two majority-minority schools, district court relied on “expert witness testimony that Terry Mill [school] had become a majority black school as a result of demographic shifts unrelated to the actions of petitioners or their predecessors”). The record in this case is filled with conflicting evidence concerning the unitary status inquiry demanded by Dowell: “whether the Board had complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination had been eliminated to the extent practicable.” 498 U.S. at —, 111 S.Ct. at 638 (footnote omitted). See also Etowah County, 963 F.2d at 1424 n. 9 (Dowell provides standard for unitariness inquiry).
This court’s decision that Topeka did not comply with its affirmative duty and did not prove that racial imbalance was not attributable to de jure segregation is tantamount to directing a verdict in favor of the plaintiffs. But this is not a case where the evidence “is so one-sided that one party must prevail as a matter of law.” See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986) (discussing directed verdict standard); Etowah County, 963 F.2d at 1425 (district court improperly granted summary judgment given “a genuine issue of material fact as to the defendant’s attainment of unitary status”). The massive record in this case contains evidence concerning student and faculty/staff assignment[3] which could support either side. See Brown, 892 F.2d at 890, 911-13 (Bal-dock, J., dissenting). We should rely “on the informed judgment of the district court[ ] in the first instance.” See Swann, 402 U.S. at 28, 91 S.Ct. at 1282.
Although this court recognizes, as it must given the clear language of Dowell and the concession of the plaintiffs at oral argument, that the district court must consider “whether the Board had complied in good faith with the desegregation decree since it was entered,” 498 U.S. at ——, 111 S.Ct. at 638, this court then limits the good faith inquiry to events subsequent to 1986 by apparently deciding as a matter of law that Topeka cannot demonstrate good faith before 1986.[4] See Court’s Opinion at 592. *596 In evaluating good faith compliance, the district court may consider that “with the passage of time the degree to which racial imbalances continue to represent vestiges of a constitutional violation may diminish ....” Freeman, — U.S. at —, 112 S.Ct. at 1446. Deciding these highly factual points as a matter of law is perfectly consistent with this court’s prior appellate factfinding and strong reluctance to return this case to the district court to revisit events prior to 1986.
This court’s remand of the case for formulation of another desegregation plan may be a costly and unnecessary exercise in social engineering given the demographic characteristics which the district court determined were now responsible for student assignment patterns.[5] The Supreme Court recognized that the mobility of American society and the private residential choices of Americans frequently contribute to racial imbalance. Freeman, — U.S. at —, 112 S.Ct. at 1448. See also Flax v. Potts, 915 F.2d 155, 161-62 (5th Cir.1990). The Court held that a school district is not required to racially balance student assignments “in the late phases of carrying out a decree, when the imbalance is attributable neither to the prior de jure system nor to a later violation by the school district but rather to independent demographic forces.” Freeman, — U.S. at —, 112 S.Ct. at 1447.
In reaching this holding, the Supreme Court apparently relied on the following facts:
In the case before us the District Court designed a comprehensive plan for desegregation of DCSS in 1969, one that included racial balance in student assignments. The desegregation decree was designed to achieve maximum practicable desegregation. Its central remedy was the closing of black schools and the reassignment of pupils to neighborhood schools, with attendance zones that achieved racial balance. The plan accomplished its objective in the first year of operation, before dramatic demographic changes altered residential patterns. For the entire 17-year period the respondents raised no substantial objection to the basic student assignment system____
Id. Although the Court indicated that the plan achieved racial balance, the plaintiffs introduced evidence that 5.6% of the student population was black in 1969, yet two elementary schools had majority-minority student assignment (76% and 51% black). Id. — U.S. at-, 112 S.Ct. at 1439. As noted, the district court “found the racial imbalance in these schools was not a vestige of the prior de jure system.” Id.
Here, the district court concluded that demographic forces are responsible for the racial composition in Topeka’s schools. Brown, 671 F.Supp. at 1310. This court claims that such a conclusion “is in considerable tension with the district court’s observations that demographics have had a desegregative influence on student assignment in Topeka’s schools.” Court’s Opinion at 590 n. 6 (citing Brown, 892 F.2d at 874). The district court, however, appears to have made that observation primarily in the context of increased minority enrollment in- schools which have had high concentrations of white enrollment. See Brown, 671 F.Supp. at 1300. The district court did attribute higher than average minority enrollment in many schools to demographic factors, unrelated to school board action. See id. at 1301-03. This court also discounts the demographic element given “the school district’s failure to ever operate without racially identifiable schools, and the district court’s failure to apply the appropriate legal standard____” Court’s Opinion at 590 n. 6. This statement rests on this court’s overinclusive definition of racial identifiability, see Brown, 892 F.2d at 911-912 (Baldock, J., dissenting); Lee v. Macon County Board of Educ., 970 F.2d 767, 774 n. 23 (11th Cir.1992) (noting that a school which is 64% black is not racially identifiable; a school which is 94% black *597 is), and liability in the absence of racial balance, regardless of the showing made by the school district which has the substantial, but not insurmountable, “burden of showing that any current imbalance is not traceable, in a proximate way, to the prior violation.”[6] See Freeman, — U.S. at-, 112 S.Ct. at 1447 (emphasis added). I would require the district court to reconsider the demographic variable on remand. Use of current data is essential.[7]
This court attempts to distinguish Do-well and Freeman from Brown on the basis that school authorities in Oklahoma City and DeKalb County conducted aggressive desegregation efforts, but that Topeka did “very little” and the best that can be said is that Topeka did not resist demographic changes which improved racial balance. First, Topeka has successfully implemented two desegregation plans. See Brown, 892 F.2d at 895-98, 904-08 (Baldock, J. dissenting). Second, Topeka has no one-race minority or virtually one-race minority schools; only three schools were majority-minority in 1985-86; Belvoir (61.-86% minority), Highland Park North (57.-93%) and Lafayette (56.81%).[8] See id. at 936-37 n. 43, 939 n. 45, 939-40 n. 46.
There are remarkable similarities between Freeman and the facts of this case, but Topeka has far less racial imbalance than DCSS[9] and probably has done at least as much as DCSS (and over a longer period of time) to encourage racial balance. Of obvious concern to the plaintiffs in Freeman were the following facts: (1) in a system in which forty-seven percent of the students were black, fifty percent of the black students attended schools which were 90+% black, (2) five out of twenty-two high schools were 90%+ black, and (3) eighteen of seventy-four elementary schools were 90%+ black. Topeka has no 90%+ black schools, although it does have three elementary schools which have a slight majority of minority students. Approximately twenty-five percent of the black elementary students attend these three schools.
Notwithstanding the understandable concerns of the Freeman plaintiffs concerning racial balance, the Supreme Court necessarily determined that DCSS had satisfied its affirmative duty to desegregate as to student assignment after the first year of a 1969 plan which closed black schools and reassigned students to neighborhood *598 schools, with attendance zones that achieved racial balance.[10] — U.S. at -, 112 S.Ct. at 1447. Topeka also employed a neighborhood plan. In Freeman, the district court determined that two majority-minority schools in 1969 were not vestige schools. — U.S. at -, 112 S.Ct. at 1439. Here, the district court determined that the three majority-minority schools were not vestige schools. Brown, 671 F.Supp. at 1301-03. In Freeman, the plaintiffs did not raise their complaint about the student assignment system for seventeen years after enactment of the plan, — U.S. at -, 112 S.Ct. at 1447; Brown was dormant for twenty-four years, 671 F.Supp. at 1291-92.
Even at this late stage in the desegregation litigation (thirty-seven years after Brown I, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954)), the school board is obligated to remedy racial imbalance, but only if it is a vestige of the de jure system. Freeman, — U.S. at -, 112 S.Ct. at 1447. We cannot lose sight that “[t]he mix that would have occurred but for the racism is a judicially created hypothetical.” Overton, 834 F.2d at 1176. After thirty-seven years, the school district must be allowed to focus on the promise of a public school education to develop the potential in every child, notwithstanding declining enrollments, limited governmental resources and social problems. Our Constitution does not elevate punitive over practical considerations. See Harris v. Crenshaw County Bd. of Educ., 968 F.2d 1090, 1096-97 (11th Cir.1992); Overton, 834 F.2d at 1177.
Once a school district has demonstrated that it has operated free of the taint of intentional segregation, control must devolve to local authorities. Withholding unitary status until perfect racial balancing occurs cannot guarantee tolerance, remedy ignorance or obliterate prejudice. Rather, it serves to distance the patrons of the school district from school officials by permanently displacing state and local authority guaranteed by the Constitution. It also minimizes the arduous gains in racial equality and reneges on the promise of eventual autonomy made to a school district which has operated in good faith. Imposing a remedy on Topeka in the manner adopted by this court, when the district court legitimately could find otherwise were it allowed to exercise its traditional factfinding power, betrays “the sense of basic fairness inherent in equity,” especially important in this sensitive area. See Swann, 402 U.S. at 31, S.Ct. at 12. Because I believe that the case should be remanded for reconsideration of all issues by the district court in light of the directly relevant and new authority commended to *599 us by the Supreme Court, I respectfully dissent.

. The district court’s observation that the passage of time and demographic changes "detract from the justification,” Brown v. Board of Educ., 671 F.Supp. 1290, 1295 (D.Kan.1987), for the presumption that racial imbalance is attributable to the school board is similar to Justice Scalia’s observation in Freeman: "At some time, we must acknowledge that it has become absurd to assume, without any further proof, that violations of the Constitution dating from the days when Lyndon Johnson was President, or earlier, continue to have an appreciable effect upon current operation of schools." — U.S. at —, 112 S.Ct. at 1453 (Scalia, J., concurring). Be that as it may, the district court indicated that, regardless of the presumption, the “defendants have proven by a preponderance of the evidence that U.S.D. #501 is a unitary school system." Brown, 671 F.Supp. at 1295 (emphasis added).

. In its prior opinion holding the district court’s unitariness finding "clearly erroneous,” this court claimed that it did not rely on expert opinion, but rather uncontroverted evidence concerning the racial composition of the various schools and what the school district did or did not do to meet its affirmative duty. Brown, 892 F.2d at 868 n. 50. See also id. at 911-913 (Baldock, J., dissenting). The Supreme Court is fully aware of the importance of expert testimony in school desegregation cases. This case is ho different. The conflicting expert testimony in this case should be considered by the trier of fact.

. The data on faculty/staff assignment is particularly well-suited for district court findings. See Brown, 892 F.2d at 927-935 (discussing problems with this court’s factual findings).

. Identifying a "potential problem with Dowell," this court determines that to demonstrate "good faith,” before incremental withdrawal of federal control will be allowed, a school system must demonstrate its "continued commitment to integration.” Court’s Opinion at 592. This' requirement could make the withdrawal of federal court supervision more apparent than real if it requires the promise of affirmative conduct on the part of the school board once a district becomes unitary. Good faith compliance with a desegregation decree "over a reasonable period of time” is relevant because it is "evidence that any current racial imbalance is not the product of a new de jure violation, and enables the district court to accept the school board’s representation that it has accepted the principle of racial equality and will not suffer intentional discrimination in the future.” Freeman, — U.S. at —, 112 S.Ct. at 1449-50 (emphasis added and citation omitted). Although this court is anxious to deal with “the possibility of immediate resegregation following a declaration of unitariness,” Court’s Opinion at 592, that question is not before us. This court's forward cast to the definition of good faith appears to be from the same bolt of cloth as Dowell v. Board of Educ., 890 F.2d 1483, 1490 (10th Cir.1989) ("For this reason, the court’s jurisdiction extends beyond the termination of the wrongdoing ... because an injunction seeks to stabilize a factual setting with a. judicial ordering and maintain that condition which the order sought to create.”) (citation omitted), rev'd, 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991).

. The district court found that de jure system was not responsible for residential choice which resulted in racially imbalanced schools. Brown, 671 F.Supp. 1290. See also Freeman, — U.S. at -, 112 S.Ct. at 1454 (Souter, J., concurring) (school segregation may cause residential segregation).

. The similarity between Justice Blackmun’s opinion concurring in the judgment in Freeman, — U.S. at-, 112 S.Ct. at 1457-60, and this court’s opinion in Brown, 892 F.2d 851, is all too obvious. Justice Blackmun thought it imperative that the district court reexamine its conclusion that DCSS had met its affirmative duty and was unitary with respect to student assignment. Freeman, — U.S. at-, 112 S.Ct. at 1460. He was of the view that, analyzed under the correct legal principles, DCSS could not prove that its past segregative acts were not responsible for current (and pronounced) racial imbalance. A majority of the Court, however, did not join in that approach. We should not follow it here.

. As Judge Selya recently observed in another context:
One implication of the recent Supreme Court school desegregation decisions is that federal courts, at least in the minerun of civil rights and institutional reform cases, have no choice but to make decisions about the maintenance, modification, or dissolution of structural remedial orders by referring to the most current population statistics readily available. After all, knowledge of demographic shifts is essential for determining whether patterns of minority representation in state institutions and organizations reflect state action, which has constitutional implications, or private preferences, which, generally, do not. See, e.g., Freeman v. Pitts, — U.S. -,---, ---, 112 S.Ct. 1430, 1437-38, 1447-48, 118 L.Ed.2d 108 (1992)
Mackin v. City of Boston, 969 F.2d 1273, 1276-77 (1st Cir.1992).

. Belvoir and Highland Park North were annexed to the Topeka district in 1959 with substantial majorities of white students; Lafayette was an all white de jure school in 1954. See Brown, 892 F.2d at 936, 938-39 (Baldock, J., dissenting). The district court in Freeman relied on similar facts in concluding that two majority black schools were not vestige schools in 1969. — U.S. at -, 112 S.Ct. at 1439.

. Topeka also has far less racial imbalance than that created in Oklahoma City under a 1984 student reassignment plan. The plan resulted in eleven out of sixty-four elementary schools becoming 90% + black as to student assignment. Dowell, 498 U.S. at-, 111 S.Ct. at 634.

. The court of appeals had flatly rejected the district court’s decision that DCSS had no further responsibility concerning student assignment:
The plaintiffs argue that DCSS never achieved a constitutionally-sufficient level of desegregation. The plaintiffs argue that until the DCSS achieves unitary status, it must affirmatively move toward the maximum practical level of desegregation. The plaintiffs also argue that demographic shifts do not excuse the DCSS’s resegregation.
The DCSS argues that it fulfilled its duties in the area of student assignment when it closed all de jure black schools following the district court's 1969 order. The DCSS argues that the district court properly refused to find it responsible for segregation caused by demographic changes.
We hold that a school system that has not achieved unitary status must take affirmative steps to gain and maintain a desegregated student population. The DCSS may not shirk its constitutional duties by pointing to demographic shifts occurring prior to unitary status. Accordingly, we reverse the district court’s conclusion that DCSS fulfilled its constitutional obligations in the area of student assignment.
Student segregation, prior to achieving unitary status, indicates that vestiges remain. Therefore, the DCSS must continue to work toward desegregation until it removes all vestiges. The fact that the DCSS achieved racial parity in the area of student assignment on the day it closed the de jure black schools does not demonstrate that it fulfilled its duties to achieve maximum possible desegregation and to avoid the reestablishment of a dual system.
Pitts v. Freeman, 887 F.2d 1438, 1448-49 (11th Cir.1989) (footnote omitted), rev’d, — U.S. -, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992).